[Cite as *In re H.M.*, 2019-Ohio-3721.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### LOGAN COUNTY

IN RE:

    H.M.,                          CASE NO.  8-18-46

DEPENDENT CHILD.

[RACHEL M. - APPELLANT]          O P I N I O N

IN RE:

    S.M.,                          CASE NO.  8-18-47

DEPENDENT CHILD.

[RACHEL M. - APPELLANT]          O P I N I O N

IN RE:

    H.M.,                          CASE NO.  8-18-55

DEPENDENT CHILD.

[JOEL M. - APPELLANT]          O P I N I O N

IN RE:

    S.M.,                          CASE NO.  8-18-56

DEPENDENT CHILD.

[JOEL M. - APPELLANT]          O P I N I O N

**Appeals from Logan County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 16 CS 0071 and 16 CS 0087**

**Judgments Affirmed**

**Date of Decision:   September 16, 2019**

**APPEARANCES:**

   *Alison Boggs* **for Appellant-Mother**

   *Bradley Jeckering* **for Appellant-Father**

   *Stacia L. Rapp* **for Appellee**

**SHAW, J.**

   **{¶1}** Mother-appellant, Rachel M. ("Rachel"), and Father-appellant, Joel M. ("Joel"), individually bring these appeals from the September 11, 2018, judgments of the Logan County Common Pleas Court, Juvenile Division, granting permanent custody of two of their children, H.M. and S.M., to Logan County Children's Services ("LCCS").  On appeal, both parents contend that the trial court's decision granting permanent custody to LCCS was against the manifest weight of the evidence, that LCCS failed to engage in reasonable efforts to support reunification,

that the GAL and the appointed CASA/GAL failed to perform necessary duties, that the trial court erred by failing to timely implement a reunification plan, and that appellants' religious traditions were violated in this matter. In addition, Rachel argues that the trial court erred by denying Joel's motion to dismiss the permanent custody motions, and she contends that she received ineffective assistance of counsel at the final hearing on the permanent custody motion.

*Background*

{**¶2**} Joel and Rachel are married and they are the parents of four children. The two oldest children are boys and are not subject to these permanent custody actions.[1] The two youngest children, H.M., born in September, 2003, and S.M., born in August of 2005, are both girls and are the children that are the subjects of these cases. The younger child, S.M., has cerebral palsy, required significant care, and was fully reliant on others for her needs. S.M. received a settlement from the federal government in excess of $1.2 million for her care. That money was held in trust.

{**¶3**} On December 3, 2015, a complaint was filed in trial court case 15CS0092 alleging that S.M. was an abused, neglected, and dependent child. The complaint alleged that a "mandated reporter" claimed that S.M. had a black, swollen eye, and that her parents denied knowing how it happened. (15CS0092, Doc. No.

---

[1] In fact, the oldest male is now over 18.

2). The reporter indicated that a week prior, S.M. had a quarter-sized reddish mark on her left knee. Further, the complaint alleged that S.M.'s palsy left her wheelchair bound and that requests had been made for over a year to obtain particular shoes that would help S.M. attempt to walk, but they had not been acquired by the parents. In addition, it was alleged that S.M.'s wheelchair was missing a lap belt and a head rest, and that there were concerns over her feeding, as she was being fed "baby food." (*Id.*)

{¶4} The complaint indicated that Rachel admitted that she fed S.M. baby food because money was "tight," and that she thought S.M. sustained her injury by getting stuck under her "bicycle/walker." (*Id.*) S.M. was nonverbal so she could not be interviewed. LCCS alleged that Joel was not cooperative, that someone was not always present with S.M., and that Rachel had no access to a vehicle or money to care for/transport S.M. in the event that Joel was away from the home. In the complaint, LCCS initially requested legal custody to remain with the parents, with LCCS being awarded court-ordered supervision. Jenna Wasserman was appointed as *Guardian ad Litem* ("GAL") for S.M.

{¶5} A hearing was held on December 29, 2015, on the motion for issuance of temporary orders. As a result of the hearing, Rachel and Joel were ordered to undertake a mental health assessment, follow the recommended course of treatment,

execute the necessary release forms, and cooperate with LCCS, the trial court, and the GAL.

{¶6} The GAL filed an initial report on February 22, 2016, indicating that S.M.'s parents were distrustful of LCCS personnel and that Joel's attorney said not to speak to the GAL without his attorney present. The GAL indicated that these factors were significant inhibitors in conducting an investigation and were contrary to the trial court's order. Nevertheless, the GAL indicated that Rachel had been more cooperative than Joel. The GAL's report stated that she observed Rachel interact with her children and that she conducted a home visit.

{¶7} A case plan was filed that same day, requiring Rachel to contact a domestic violence counselor or any approved mental health therapist, to follow recommendations by service providers, and to sign releases for information. The plan required Joel not to "control" Rachel, to allow her to be an equal partner in the marriage, and for both parents to allow case workers to have access to the children, the household, and the records. (15CS0092, Doc. No. 41). Joel controlled the money in the household and had the only means of transportation. Rachel also indicated she felt that she did not have a voice in family matters.

{¶8} An adjudication hearing was held on February 22, 2016, wherein S.M. was found to be a dependent child by stipulation of the parties as defined in R.C. 2151.04(C). The allegations of abuse and neglect were dismissed. S.M. was

maintained in the family home, a case plan was ordered, and LCCS was granted court-ordered protective supervision of her. An entry journalizing the matter was filed on March 10, 2016.

{¶9} On April 6, 2016, LCCS filed a motion for alteration of temporary orders on an emergency basis, indicating that LCCS had not had contact with the family and that S.M. had missed her last five scheduled therapy appointments. A mandated reporter stated that she was concerned that S.M. was suffering from pneumonia or an upper respiratory infection and that S.M. was not getting the appropriate treatment. Moreover, "[s]he stated that if the minor child does not continue with therapy that her muscle contractures will worsen and she will get irreversible tightness of her joints that will prevent her bones from growing appropriately," which could then in turn impact organ growth. (15CS0092 Doc. No. 53). LCCS requested temporary custody of S.M. That motion was granted and S.M. was placed in the emergency temporary custody of LCCS.

{¶10} On April 7, 2016, the GAL filed a report stating that she had also not had any contact with the family since the prior adjudication hearing despite her efforts. The report stated that the parents were still not cooperating or releasing records, and that they were failing to take S.M. to appointments necessary for her health. The GAL argued that the family had shown a "pattern of non-cooperation that leaves [S.M.] at risk." (15CS0092, Doc. No. 52).

{¶11} That same day a shelter care hearing was held wherein it was determined that probable cause existed to believe that removal of S.M. from the home was necessary. LCCS thus retained temporary custody of S.M., and the parents were granted visitation.

{¶12} On June 1, 2016, a complaint was filed in trial court case 16CS0071 regarding Joel and Rachel's older daughter alleging that H.M. was an abused, neglected, and dependent child. It was alleged that H.M. had been sexually abused by both of her older male brothers. The complaint stated that LCCS also had received reports that lewd photographs had purportedly been taken of one of the incidents. In an initial forensic interview, H.M. denied that the incidents occurred, and thus they were labeled "unsubstantiated;" however, H.M. later made disclosures in a separate forensic interview to cause LCCS to label the incidents as "substantiated." Moreover, Rachel also indicated at one point that H.M. had informed her of the incidents, and that the family "prayed" over the matter so that the boys would stop, but no further action was taken by the parents.

{¶13} The complaint indicated that Rachel was concerned for the immediate safety of H.M. because Rachel was no longer residing in the household, thus leaving H.M. potentially alone with the boys. Rachel was named temporary legal custodian of H.M. Jenna Wasserman, the GAL for S.M., was also appointed as GAL for H.M.

{¶14} On July 21, 2016, H.M. was adjudicated dependent based upon stipulation of the parents and the facts as outlined in the complaint, and the allegations of abuse and neglect were dismissed. The parents were ordered to submit to a forensic parenting evaluation and to follow any resulting recommendations. At that time H.M. was removed from Rachel's care and placed in the temporary custody of LCCS as Rachel was dealing with health issues. In addition, relatives and/or church friends were unavailable to provide kinship care. The effective date of H.M.'s removal was July 21, 2016.

{¶15} On August 9, 2016, a dispositional hearing was held on H.M.'s dependency case. A case plan was filed and approved, LCCS remained temporary legal custodian and the parents were awarded supervised visitation.

{¶16} LCCS maintained temporary custody of both S.M. and H.M. through various extensions in 2016 and 2017 while the parents were supposed to be attempting to work the case plan in each matter. Meanwhile, S.M. was placed in foster care with a family that had its own special needs children and was familiar with S.M.'s particular situation. H.M. was placed in a separate foster home.

{¶17} Joel and Rachel eventually got the psychological evaluations they were ordered to obtain, once they were satisfied with the selected examiner—Dr. Fredrick Sacks, a psychologist. On April 20, 2017, the evaluations were filed. In her evaluation, Rachel detailed a number of health issues including digestive and

low iron problems, which limited her capacity to function and interfered with her ability to provide and care for her children. Rachel indicated that she could not visit her daughters in foster care every week because of her health.

{¶18} The evaluation indicated that Rachel had "multiple mental health issues that have the potential for interfering with and limiting her parenting effectiveness." (15CS0092, Doc. No. 115). Further, the evaluation stated that Rachel displayed symptoms of someone suffering from "controlling" domestic violence, PTSD, persistent depressive disorder, generalized anxiety, and somatic symptom disorder. (*Id.*)

{¶19} As to Joel's assessment, the evaluator found that Joel was contentious, self-righteous, eager to transfer blame, and that he would likely continue to be uncooperative and controlling. The evaluator found that Joel was at high risk to be a perpetrator of abuse, that it was doubtful that he would follow through with treatment recommendations, and Joel was diagnosed with unspecified personality disorder. On nearly all of the tests administered to Joel, he was found to be deceptive, inauthentic, and untruthful. Joel exaggerated his virtues and underreported difficulties on all tests.

{¶20} On June 14, 2017, the State introduced a tentative long-term care plan for S.M. that outlined her long-term medical and educational needs when she returned home. As to H.M., a safety plan was proposed to, *inter alia*, put alarms

above the doors to the rooms. Joel's counsel was designated to formally draft the long-term care plan, and it was filed on August 28, 2017. Although there was a proposed plan for reunification, the trial court granted a final extension of temporary custody for H.M. on October 20, 2017. A reunification date was set as November 22, 2017, but was then delayed.

{¶21} In early November of 2017, H.M. made another claim of sexual abuse by one of her older brothers. As part of the evolving case plan moving toward reunification, H.M. had been engaging in unsupervised visitations in the home when her brothers were present. It was during this time that she alleged a new incident of abuse. LCCS indicated that Rachel was concerned for the safety of the children if they returned home, as Rachel did not feel she could protect them.

{¶22} On December 3, 2017, LCCS was granted emergency temporary custody of S.M. as a result of a new complaint being filed in trial court case 17CS0087. The prior case dealing with S.M., trial court case 15CS0092, was closed. S.M.'s removal was upheld at a shelter care hearing. Dennis Blank, a Court Appointed Special Advocate ("CASA") was appointed as GAL for both children. The trial court also appointed attorney Bruce French as GAL for both children.

{¶23} S.M. was again adjudicated dependent by stipulation. At the disposition hearing for S.M., an amended case plan was ordered and LCCS maintained temporary custody.

{¶24} On March 16, 2018, the State filed motions for permanent custody of both S.M. and H.M. Both Joel and Rachel individually filed their own motions for legal custody of each daughter.

{¶25} GAL Dennis Blank filed a final report recommending that LCCS's permanent custody motions be granted. His report stated, in pertinent part, "[t]his GAL's opinion is that Joel and Rachel have engaged in processes the court has requested but [have] not made sincere efforts to make changes or improve relationships with family members to eliminate the problems that started Children's Services involvement." (17CS0087, Doc. 134). GAL Bruce French filed a brief handwritten report concurring with Dennis Blank's assessment. GAL French had filed a report shortly after being assigned to this matter, and he felt it would be superfluous to reiterate what had been thoroughly covered by Blank, particularly when he agreed.

{¶26} A final hearing on the permanent custody motions was held over five days on May 18, May 25, May 29, June 28, and July 16, 2018. LCCS called numerous witnesses, including H.M., who testified to the purported sexual abuse perpetrated on her by her brothers, claiming that they forced her to perform oral sex on them individually on separate occasions. H.M. testified that when she told her parents, Joel gathered them in prayer to ask for forgiveness and to help the boys stop, but that was the extent of addressing the matter. H.M. also testified regarding

an incident with one of the boys allegedly sexually abusing S.M. In addition, H.M. testified about a separate incident wherein one of the boys asked to touch her breasts. Testimony from other witnesses indicated, and the trial court noted, that the boys had been charged with sexual assault crimes for their actions against H.M., which were pending at the time of the permanent custody hearing.

{¶27} As to her relationship with her parents, H.M. testified regarding an incident wherein Rachel left her with a church friend and broke her promise to return and pick her up shortly thereafter. H.M. testified she was strongly impacted by being left behind. She also testified that she was afraid of Joel and that he was extremely restrictive, particularly when comparing her treatment to the other children.

{¶28} As to the children's then-current state, the testimony at the permanent custody hearing indicated that both children were thriving in their placements, particularly S.M., who had been placed with a family who had children of special needs of their own. The family intended to adopt S.M. if LCCS was granted permanent custody. With her foster parents, S.M. was regularly attending her various therapies and all medical personnel indicated that she had progressed significantly. S.M. had become much more verbal, had gone from being a malnourished 44 pounds to 80 pounds, and she was eating age-appropriate foods. She was also bonded with her foster family.

{¶29} An occupational therapist testified that prior to living with her foster parents, S.M. had matted hair and inadequate hygiene. A speech/swallowing therapist testified that prior to LCCS intervention she was concerned for S.M.'s hydration and nutrition, and her positioning while eating due to signs of recurring laryngeal aspiration. S.M.'s parents had been feeding her liquids while she laid in their laps by squirting the liquids into her mouth. The swallowing therapist opined that this was leading to issues with S.M.'s immune system. The swallowing therapist offered testimony the trial court stated was "compelling" regarding S.M.'s "remarkable" improvement since being removed from the home.

{¶30} H.M. had moved from her initial foster home to a faith-based group home, and had some discipline issues but was progressing in her new placement. She indicated that she did not feel safe in her family home and that she wanted LCCS to be granted permanent custody. Although they were not in the same foster home, H.M. was bonded with her sister S.M., stating that she had regular visitation with her.

{¶31} Multiple mental health professionals that were involved with the parties testified in this matter. A counselor that Rachel and Joel were seeing testified at the hearing that he had seen some progress, albeit only recently, but not much progress. The counselor indicated that the parties were reluctant to open up to him, perhaps because of church philosophy or because of pending criminal charges

against their boys. The counselor did not have an opinion on whether the girls could go home because the parents were not "far enough along," but he affirmatively stated that the parents had not satisfied their goals for marital communication.

{¶32} Dr. Sacks also testified at the final hearing regarding his initial forensic psychological evaluations performed on Rachel and Joel and his post-evaluations of them, which had been conducted recently. Dr. Sacks found that Rachel had made some strides in finding her voice and being more assertive. However, Dr. Sacks felt that Rachel's parenting capacity was compromised and additional therapy was needed.

{¶33} As to Joel, Dr. Sacks testified, "I evaluate many hundreds and several hundred people a year, and over many years I have evaluated many, many thousands of people, and I experienced [Joel] as among the most belligerent and argumentative people that I've ever evaluated." (Tr. at 657). Dr. Sacks testified that Joel had a distorted view of his parenting, and that he viewed his children as being well-adjusted with no problems. Dr. Sacks saw no improvement in Joel's attitude or behavior and no willingness to accept any culpability. Dr. Sacks indicated that Joel was more interested in crafting an appearance of being right than of actually caring for his children. Dr. Sacks testified that Joel exaggerated his virtues, and was high on "impression management." Dr. Sacks testified that he did not believe that Joel

would benefit from psychological treatment because he was not open to receiving help.

{¶34} LCCS employees and various others testified about the repeated difficulties of dealing with Joel in this matter. Essentially all indicated he was uncooperative, some indicating that he was essentially obstructing progress for the children or the case plan at various times. For instance, it was recommended for S.M.'s health that she get Botox treatments, which would greatly assist in her muscle stretching, but Joel refused to give permission despite the medical recommendations for it. In addition, psychological evaluations were delayed, LCCS had difficulty obtaining release forms, Joel instructed Rachel not to speak to LCCS at times unless he was present, and Joel would wear headphones while medical personnel attempted to speak with him about proper care procedures for S.M.[2]

{¶35} The primary LCCS caseworker testified to her involvement in this case, indicating that it was the most time-consuming and labor-intensive case that she had ever been part of. She testified that she was concerned in the beginning about the parents not accepting the medical recommendations of professionals, and Joel's refusal to take the sexual abuse allegations against H.M. seriously. She testified she still had those concerns.

---

[2] It would be redundant to list all of the instances in the record wherein witnesses stated Joel was being difficult or uncooperative. Thus we simply emphasize that it was repeated throughout hearings, in evaluations and reports, and by witnesses at the permanent custody hearing.

**{¶36}** In addition, the LCCS caseworker testified that Joel would not allow unannounced visits until a court order was obtained. The caseworker testified that LCCS was out of time and had worked with the family for two years. She testified that at that time no options or plans existed that could have resulted in successful reunification of the family as concerns had not been alleviated, though Rachel had made some progress. The caseworker testified that if Joel was not in the picture her recommendation *might* change, but Rachel would still need a substantial amount of support to be able to care for her children.

**{¶37}** GAL Dennis Blank testified that while he felt both parents loved their children, not one counselor had reported that the parents had resolved their issues. He testified that he did not believe that either parent had the capacity to nurture and protect the girls. He recognized that the parents had begun working with service providers, but they had waited too long and the children needed permanency. GAL Bruce French concurred, though he indicated Dennis Blank focused on the family and GAL French focused on obtaining the financial information from S.M.'s trust, which he felt was significantly under-utilized, though it had been used to purchase appellants' home, a handicapped van, and a therapy room for S.M.

**{¶38}** There was a significant amount of additional testimony. Of particular note was extensive cross-examination of LCCS witnesses as to how they could have supported a reunification plan late in 2017 with the allegations of sexual abuse

against the brothers. One LCCS employee indicated that the reunification plan included safety measures. However, witnesses testified that removing the boys from the home rather than the girls was not considered.

{¶39} On September 11, 2018, the trial court filed a 42-page judgment entry granting LCCS's permanent custody motions. In its entries, the trial court summarized the procedural history and then summarized the testimony from each individual witness at the final hearing. The trial court also addressed the exhibits that had been entered into evidence including the GAL reports and the objections to them. Then, the trial court found that LCCS had conducted reasonable efforts to support reunification, spending multiple pages addressing the matter. Finally, after determining that the concerns that led to the removal of the children had not been alleviated, and determining that the children had been in the temporary custody of LCCS for twelve or more months of a consecutive twenty-two-month period, the trial court determined by clear and convincing evidence that it was in the best interests of the children that LCCS be awarded permanent custody.

{¶40} Both parents individually filed appeals.[3] Rachel asserts the following assignments of error for our review.

**Rachel's First Assignment of Error**
**The trial court's decision is against the manifest weight and sufficiency of the evidence. Appellee did not prove by clear and**

---

[3] There are four appellate numbers in this case: one for Rachel's appeal of S.M., one for Rachel's appeal of H.M., one for Joel's appeal of S.M., and one for Joel's appeal of H.M.

convincing evidence that the court should grant its motion for permanent custody of the minor children.

### Rachel's Second Assignment of Error
The trial court erred when it failed to ensure the implementation of the agreed upon joint long term care plan, which is case plan 1.05, calling for reunification of the children with Appellant.

### Rachel's Third Assignment of Error
The trial court erred when it overruled Appellant's motion to dismiss Appellee's motion for permanent custody.

### Rachel's Fourth Assignment of Error
The trial court erred in finding Appellee used reasonable efforts to prevent the initial removal, continued removal and reunification of the children throughout the case.

### Rachel's Fifth Assignment of Error
The Children's Guardian Ad Litem and CASA failed to perform necessary duties pursuant to Ohio Revised Code Section 2151.281 and Superintendence Rule 48, to Appellant's detriment and in violation of her due process.

### Rachel's Sixth Assignment of Error
The trial court violated Appellant's religious freedom when it allowed appellee to use certain religious traditions of the parents as reasons to not reunify the children with Appellant.

### Rachel's Seventh Assignment of Error
Appellant was deprived effective assistance of counsel, which resulted in Appellant losing permanent custody of her children.

{¶41} Additionally, in his own appeal, Joel asserts the following assignments

of error for our review.

### Joel's First Assignment of Error
The trial court's decision to terminate Joel's parental rights and grant permanent custody to the State and deny Joel's motion for

**custody is not supported by sufficient evidence and/or is against the manifest weight of the evidence.**

**Joel's Second Assignment of Error**
**The trial court erred in finding the State and the Agency used reasonable efforts to prevent the initial removal and continued removal of H.M. and S.M. throughout this matter.**

**Joel's Third Assignment of Error**
**The trial court committed plain error when it unreasonably delayed the implementation of the agreed joint long term care plan for S.M. for over three months.**

**Joel's Fourth Assignment of Error**
**The failure of CASA/GAL Blank and GAL French to observe visitation with and between Joel, H.M., and S.M. prejudiced Joel and deprived Joel of his due process rights.**

**Joel's Fifth Assignment of Error**
**The trial court violated Joel's religious freedom in violation of the First Amendment of the U.S. Constitution when the trial court allowed the State to infringe upon his religious rights and traditions as reasons not to reunify the children.**

{¶42} We elect to address some of the assignments of error together, particularly where the issues overlap between Joel and Rachel. We also elect to address some of the assignments of error out of the order in which they were raised.

*Rachel's First Assignment of Error;*
*Joel's First Assignment of Error*

{¶43} In Rachel's first assignment of error, she argues that the trial court's determination awarding permanent custody to LCCS was against the manifest

weight of the evidence. In Joel's first assignment of error, he also challenges the trial court's determination as against the manifest weight of the evidence.[4]

Standard of Review

**{¶44}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *Id.* quoting *Santosky v. Kramer*, 455 U.S. 645 (1982); *In re Leveck*, 3d Dist. Hancock No. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Leveck* at ¶ 6. An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

**{¶45}** Clear and convincing evidence is evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a

---

[4] In the statements of Joel and Rachel's assignments of error, they contend that the trial court's decision was also not supported by sufficient evidence; however, their actual arguments focus on manifest weight, and utilize the manifest weight standard of review. We will not manufacture a sufficiency challenge for Joel and Rachel merely because they stated the words in their assignments of error. Nevertheless, even if they did more specifically argue sufficiency of the evidence, as the discussion *infra* makes clear, there is sufficient evidence presented to support the trial court's decision, and the review on appeal is properly directed toward a question of weight of the evidence.

reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶46} Moreover, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier-of-fact. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶47} Furthermore, " '[w]eight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier-of-fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." ' " *Eastley v. Volkman*,

132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting Black's Law Dictionary 1594 (6th ed. 1990).

**{¶48}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley* at ¶ 20, quoting *Tewarson v. Simon,* 9th Dist. Lorain No. 99CA007526, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (2001), quoting *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord In re Pittman,* 9th Dist. Summit No. 20894, 2002-Ohio-2208, ¶¶ 23–24.

Controlling Statutory Authority

**{¶49}** Revised Code 2151.414 sets forth the guidelines a trial court must follow when determining a motion for permanent custody. Revised Code 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶50} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two-month period.

{¶51} "[T]he findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, [and] each is independently sufficient to use as a basis to grant the Agency's motion for permanent custody." *In re M.R.,* 3d Dist. Defiance No. 4–12–18, 2013–Ohio–1302, ¶ 80. Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 3d Dist. Marion Nos. 9-

13–43, 9–13–44, and 9–13–45, 2014–Ohio–1136, ¶ 30, citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14.

**{¶52}** In sum, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

Twelve of Twenty-Two-Months in Agency Custody<br>and Revised Code 2151.414(B)(1)(d)

**{¶53}** In this case, the trial court found that both H.M. and S.M. had been in LCCS's temporary custody in excess of twelve months of a consecutive twenty-two-month period pursuant to R.C. 2151.414(B)(1)(d), which reads as follows

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **\* \* \***
>
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period[.]**

{¶54} After reviewing the evidence related to the children's custody situations under R.C. 2151.414(B)(1)(d), the trial court stated that, "S.M. entered the temporary custody of LCCS on April 6, 2016, with the qualifying date of sixty (60) days later being June 5, 2016, and H.M. entered the temporary custody of LCCS on July 21, 2016, with (60) days later being September 19, 2016." (Doc. No. 260; Doc. No. 194). The record is clear that LCCS filed its permanent custody motions on March 16, 2018. Thus by plainly looking at the dates, which began in 2016 and ended in 2018, LCCS had temporary custody of S.M. and H.M. well in excess of twelve months. Rachel appears to concede this point in her brief. Regardless, the trial court's findings that the children had been in the temporary custody of LCCS in excess of twelve months are supported in this matter by the dates in the record.

{¶55} Nevertheless, Joel cites to a case out of the Sixth District Court of Appeals, *In re K.L.*, 6th Dist. Lucas Nos. L-17-1201, L-17-2010, 2017-Ohio-9003, wherein it was determined the "consecutive twenty-two month period" referenced in R.C. 2151.414(B)(1)(d) meant that there had to be twenty-two consecutive months of agency involvement when the permanent custody motion was filed. He contends that LCCS had not been involved with the children in this matter for twenty-two consecutive months, even if the children had been in LCCS's temporary custody for well in excess of twelve months.

**{¶56}** The interpretation of the Sixth District in *In re K.L.*, and espoused by Joel, was rejected by the Eleventh District Court of Appeals in *In re N.M.P.*, 11th Dist. Portage No. 2018-P-0056, 2018-Ohio-5072.[5]   The Eleventh District determined that the Sixth District erroneously added the words "agency involvement" to R.C. 2151.414(B)(1)(d).  *In re N.M.P.* at ¶ 32.  Further, the Eleventh District determined that the plain and unambiguous language refers to twelve months in a consecutive twenty-two-month period, *irrespective of the total length of an agency's involvement*.   The Eleventh District's interpretation is consistent with our own application of the statute, and our view regarding the statute at issue.  *See In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 17 (being in agency custody for over sixteen consecutive months satisfies the twelve of twenty-two requirement); *see also In re. S.W.*, 3d Dist. Marion Nos. 9-18-29, 9-18-30, 2019-Ohio-2068, ¶¶ 22-23.

**{¶57}** Based on the evidence presented, we cannot find that the trial court's determination that S.M. and H.M. were in the temporary custody of LCCS for more than twelve months of a consecutive twenty-two-month period was against the

---

[5] There is currently a certified conflict pending before the Supreme Court of Ohio on this issue.  *See In re N.M.P.*, Supreme Court Case Number 2018-1842.  On July 9, 2019, the Supreme Court of Ohio held oral arguments on the matter.

manifest weight of the evidence. Thus we will proceed to the next prong of the permanent custody test.[6]

Best Interest Factors Pursuant to R.C. 2151.414(D)

**{¶58}** Revised Code 2151.414(D) contains factors for a trial court to consider when determining whether granting permanent custody to an agency is in the best interests of a child. It reads as follows.

> **(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:**
>
> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of**

---

[6] Both parents seem to make an argument that the trial court did not make adequate findings under R.C. 2151.414(E) to support its decision. However, the trial court was not required to do so because the beginning (E) factors are addressed when analyzing R.C. 2151.414(B)(1)(a), which is an *alternative finding* to R.C. 2151.414(B)(1)(d). The trial court need not find both, and thus did not err in this matter, contrary to the arguments of appellants. *See, e.g.*, *In Re: B.S.*, 5th Dist. Holmes No. 17CA020, 2018-Ohio-616, ¶¶ 43-45.

**the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶59} In this case, after thoroughly summarizing the testimony and exhibits presented, and then finding that S.M. and H.M. had been in the temporary custody of LCCS for twelve or more months of a consecutive twenty-two-month period, the trial court proceeded to address the "best interest" factors in R.C. 2151.414(D)(1) over several pages of its judgment entries. Ultimately the trial court concluded that it was in the best interests of both children that LCCS be awarded permanent custody, reasoning, in part, as follows.

> **The Court is convinced that the respective problems of each parent are so serious and chronic, that even with additional time to engage in on-going services, there is no chance for successful reunification. There is no reason to believe that Father or the brothers fully comprehend the dynamics of abuse and its negative and traumatic impact on victims. * * * Mother admitted that the parents cannot protect the children and the forensic evaluation shows that Mother cannot either. The girls deserve permanency.**
>
> **Father and Mother's respective mental health issues regrettably operate as impediments to their ability to support and nurture each other and clearly impact their abilities to parent and meet the needs of their daughters. The Court is convinced that the concerns that existed when each case opened has not been remedied. Both parents bear some responsibility in delaying the initial start of the forensic evaluations. Father's distrust for the**

**system interferes with his ability to gain insight to his problems and needs to change.  * * ***

**He simply cannot provide and meet[] the general and individual needs of each daughter.  Father's mental health issues, combined with his reliance on his faith; resistance to consider the advice of health care providers; inability to cope with reported abuse among his children; distrust of government – interferes with his amenability to accept that his perception of the world is unhealthy and prevents him from receiving help that has been offered.**

**Mother has her own set of challenges both, physically and emotionally, that impede her ability to raise her daughters.  Mother may be amenable to professional recommendations but this will take a number of years and lots of support.  The Mother herself, courageously admitted that she cannot protect her children.**

**\* \* \***

**The testimony of the health care providers was compelling.  S.M. is a happy child who has made great and drastic health improvements, both physically and emotionally, since being removed from her family.**

**The foster family has indicated a willingness and desire to adopt S.M. \* \* \***

**H.M. is doing well in foster care and was able to clearly articulate her wishes.  Despite loving her parents, she does not want to return home.  H.M. feels like a second-class citizen compared to how her brothers are treated by Father.  Mother shared a concern with LCCS that corroborated by [sic] H.M.'s testimony.  * * * H.M. cannot be returned to the family home where her brothers are because neither parent has the capacity to protect her.  Dr. Sacks testified that Father views his children [as] well-adjusted and have no problems.  This is alarming.**

**Both girls deserve legally secure placements that provide permanency.  The Court is convinced that to return either child**

> **back to the custody of their parents is not in their best interest. \* \* \* \* Mother lacks the energy to protect her children and Father pours all of his energy into his own needs and cannot protect his children. Father continues to engage in positive impression management rather than deal with the reality of the family problems.**
>
> **\* \* \***
>
> **The Court HEREBY FINDS by clear and convincing evidence that [it] is in the best interest of S.M. to have permanent custody granted to LCCS. The Court also FINDS that [it] is in the best interest of H.M. to have permanent custody granted to LCCS.**

(Doc. No. 260; Doc. No. 194).

{¶60} In our own review of the trial court's best interests determination based on the factors, we begin with R.C. 2151.414(D)(1)(a), which concerns the relationship with the child, the child's parents, siblings, relatives, and foster care givers. The testimony is clear, and as the trial court noted, compelling, that S.M. is thriving in her foster care placement, and that she is bonded with her foster family. Her needs are being met, she has improved substantially going from malnourished with inadequate hygiene to eating age-appropriate foods and flourishing. The testimony did indicate that S.M. and Rachel had a good relationship, but S.M. did not share the same loving relationship with her father based on observations of their interactions.

{¶61} As to H.M., she was also doing well in her placement, and expressed her desire to remain away from the home, where she did not feel protected. In

addition, H.M. regularly got to see and bond with S.M. even though they were not in the same placement. H.M. did love her parents, but she did not feel safe with them.

**{¶62}** Regarding factor (D)(1)(b), which concerns the wishes of the child as expressed directly or through the recommendation of the GAL, both GALs testified that it was in the children's best interest that permanent custody be granted to LCCS. S.M. was nonverbal, and thus could not express her own wishes, but H.M. did explicitly testify that despite her love for her parents she wanted LCCS to be granted permanent custody.

**{¶63}** Regarding factors (D)(1)(c) and (D)(1)(d), which concern the children's custodial history and their need for permanency, as expressed previously both children had been in the temporary custody of the agency for twelve or more months of a consecutive twenty-two-month period. The children certainly need permanency and there is no indication that the parents could have the children returned to them without significant intervention at any time in the near future.

**{¶64}** Factor (D)(1)(e) concerns specific enumerated factors in another part of the statute that do not appear to be applicable to this case.

**{¶65}** After reviewing the factors on appeal, we find that there is clear and convincing evidence to support the trial court's determination that granting permanent custody to LCCS was in the best interests of the children. The trial

court's factual findings are supported by the record and we must give due deference to the credibility determinations the trial court made.

{¶66} S.M. and H.M. are doing well in their placements and the GALs both recommended that permanent custody should be granted. The parents had made little progress in counseling and the children were in need of permanency. As the trial court stated, Joel's contention that his children were well-adjusted given the sexual abuse allegations is "alarming." Thus based on the record before us, we cannot find that the trial court's determination was against the manifest weight of the evidence. Therefore Rachel's first assignment of error and Joel's first assignment of error are overruled.

*Rachel's Fourth Assignment of Error*;
*Joel's Second Assignment of Error*

{¶67} In Rachel's fourth assignment of error, and in Joel's second assignment of error, they argue that the trial court erred by finding that LCCS had engaged in reasonable efforts to prevent the initial and continued removal of H.M. and S.M. in this matter.

{¶68} At the outset, we emphasize that the trial court made findings that reasonable efforts had been undertaken by LCCS in this matter numerous times throughout the pendency of these cases without any objection by the appellants. A trial court is not specifically required to find that reasonable efforts have been made at the time of the permanent custody hearing if it has done so at prior stages of the

proceedings. *See In Re N.R.S.*, *J.N.S.*, *K.H.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08, 3-17-09, 2018-Ohio-125, ¶ 25; *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104. In this case the trial court made reasonable efforts findings at the shelter care hearings and the extension of temporary custody hearings for both children. In fact, the trial court's journal entries had a bold subheading regarding reasonable efforts, and appellants never contested this issue. Therefore we could find that appellants have waived all but plain error on appeal.

**{¶69}** Nevertheless, despite making reasonable efforts determinations throughout the pendency of these cases, in the trial court's final judgment entries granting permanent custody to LCCS, the trial court still specifically addressed LCCS's "reasonable efforts" over three pages in its entries, listing numerous areas where LCCS had engaged in reasonable efforts. The listed areas included help with transportation to appointments since Rachel could not drive, medical providers going to the home, transporting Rachel and the children to a domestic violence shelter when Rachel briefly left Joel, encouraging Rachel to get counseling, creating documents to encourage parents to regularly attend medical appointments for S.M., recommending counseling for the boys in light of the allegations that were made, etc.

{¶70} On appeal, Rachel and Joel may contend that there was little testimony regarding reasonable efforts at the permanent custody hearing, but it was directly addressed by LCCS Caseworker Bednarki in her testimony.

**Q:  What services particularly has the agency offered to the parents to assist them in protecting [H.M.] in the home?**

**A:** [Caseworker Bednarki]  **In the fall of 2017, our home visits revolved around this topic of what we could do to make reunification possible.  We talked about getting alarms on the doors and Joel did go out and get alarms for the children's bedroom doors.  We talked about continuing family therapy sessions, including the boys involved.  They had attended – Joel and Rachel had attended some family therapy session with [H.M.], but it was my understanding that the boys had never attended.  So I think that would be important.  And just understanding that at that time contact with them needed to be a hundred percent supervised.**

**Q:  What other reasonable efforts can you make to help prevent the continued removal of [S.M.] and [H.M.]?**

**A:  I've made several referrals to different therapists and service providers.  I counted up I believe ten different referrals, which is more than I've ever done on a case.  Provided transportation to and from appointments.  Offered transportation to and from appointments.  When Joel was working – I know he's ongoing working but at one point he was working and [S.M.]'s appointments were during the day at therapy and offered to take Rachel to those appointments so she could attend.  We provided transportation to [S.M.] and [H.M.] to different appointments.  Therapy, [H.M.]'s counseling.  The agency has offered gas cards to transportations [sic].  I don't believe the family has ever picked up a gas card at our agency but that was always offered because some of [S.M.]'s appointments are really far away.  Taking [S.M.] to a specialist.**

(Tr. at 514-516).

{¶71} Caseworker Bednarki's testimony indicated a significant amount of oversight in ensuring that the girls were seeing the appropriate care providers. Furthermore, the opportunity for the parents to take advantage of various services was also presented, but as several witnesses testified it was very "late in the game" when the parents decided to use these services at all, let alone actively engage with them.

{¶72} Based on the record, we cannot find that the trial court erred in finding that reasonable efforts had been made by LCCS, particularly where Caseworker Bednarki testified that it was the most labor-intensive case she had ever worked on. Therefore Rachel's fourth assignment of error is overruled, and Joel's second assignment of error is overruled.

*Rachel's Second Assignment of Error*;
*Joel's Third Assignment of Error*

{¶73} In Rachel's second assignment of error, and in Joel's third assignment of error, they argue that the trial court erred when it delayed the implementation of the "joint long term care plan" that the parties had agreed to in the fall of 2017.

{¶74} It is undisputed that in the summer/fall of 2017, the parties were preparing a reunification plan that was being drafted by Joel's attorney. That reunification plan, which called for, *inter alia*, home health care by two nurses to be in place for S.M.'s care, was filed in August of 2017. At that time, S.M. and H.M. were staying in their respective foster homes.

{¶75} After the plan was approved by all of the parties, the trial court set a hearing to have a firm date for reunification. During that time, the administrator of S.M.'s trust attempted to set up the home health care, but had difficulty because he did not have a firm date for the nurses to start. Meanwhile, gradual reunification was occurring with some unsupervised visitation between the parents and the girls. Before a hearing was held to finalize a reunification date, H.M. made new disclosures about sexual abuse perpetrated by one of her brothers during an unsupervised visitation. Following that disclosure, any plans for reunification were scuttled.

{¶76} Appellants now seek this Court to find that the trial court erred by essentially not "speeding up" the process. They desire this Court to speculate that everything would have gone smoothly had reunification occurred, despite the testimony of Dr. Sacks regarding appellants' respective parenting abilities and the alleged sexual assault by one of the boys on H.M. There is simply no basis in the record or in the law to find a reversible error here.

{¶77} Largely, appellants are complaining that they wished things had gone better in the reunification process when Joel's attorney was drafting the long term care plan. But at that time appellants had it within their power to monitor their children during visitation and follow through with recommended services such as therapy. It is the burden of appellants to demonstrate how there was a legal or

factual error, and it is simply not evident from the facts of this case. Therefore, Rachel's second assignment of error and Joel's third assignment of error are overruled.

*Rachel's Fifth Assignment of Error*;
*Joel's Fourth Assignment of Error*

{¶78} In Rachel's fifth assignment of error and in Joel's fourth assignment of error, they contend that the GALs in this case failed to perform necessary duties, depriving the appellants of their due process rights. Specifically, Rachel argues that the investigations by GAL French and CASA/GAL Blank fell below the acceptable level of involvement, and Joel argues that the GALs erred by failing to observe visitation between the parents and the children subject to these permanent custody actions.

{¶79} Revised Code 2151.281(I) governs a GAL's duties, and it reads as follows.

> **(I)   The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.**

> **The guardian ad litem shall be given notice of all hearings, administrative reviews, and other proceedings in the same manner as notice is given to parties to the action.**

**{¶80}** In addition to Revised Code 2151.281(I), Superintendence Rule 48(D) provides *guidance* regarding a GAL's duties in seventeen enumerated paragraphs. Superintendence Rule 48(D) states that a GAL should perform at minimum a certain number of duties, unless impracticable or inadvisable. Some of the duties include: representing the best interest of the child, maintaining objectivity, participating in hearings, keeping accurate records, and making reasonable efforts to become informed about the case. Making reasonable efforts to become informed about the case is stated to include meeting with the children and observing the children with parents and foster parents, visiting the children's home, ascertaining the wishes of the child, interviewing relevant school, medical, mental health providers or children's service workers, recommending psychological evaluations, and performing any other necessary investigations. Thus Superintendence Rule 48(D) contains a significant amount of guidance for a GAL.

**{¶81}** However, it is important to emphasize that Sup.R. 48 *does not create substantive rights*, even if a GAL fails to comply with the rule. *In re: W.H., H.W., J.W. III, J.W., P.W., E.W., J.W. IV*, 3d Dist. Marion No. 9-16-19, 2016-Ohio-8206, ¶ 77, citing *In re E. W.,* 4th Dist. Washington Nos. 10CA18, 10CA19, 10CA20, 2011–Ohio–2123, ¶ 12; *accord In re J.A. W.,* 11th Dist. Trumbull No.2013–T–0009,

2013–Ohio–2614, ¶ 47; *In re K. V.,* 6th Dist. Lucas No. L–11–1087, 2012–Ohio–190, ¶ 30 (stating that the Rules of Superintendence do not give rise to substantive rights, and so the filing of a GAL's report is not mandatory.). " 'They are not the equivalent of rules of procedure and have no force equivalent to a statute. They are purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants.' " *Allen v. Allen,* 11th Dist. Trumbull No.2009–T–0070, 2010–Ohio–475, ¶ 31, quoting *State v. Gettys,* 49 Ohio App.2d 241, 243, 360 N.E.2d 735, (3d. Dist.1976). Therefore, a GAL's failure to comply with his or her duties under SupR. 48(D) is not basis for reversal unless a parent demonstrates prejudice. *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 45, citing *In re K.R.*, 12th Dist. Warren Nos. CA2017-02-015, CA2017-02-019, CA2017-02, 024, 2017-Ohio-7122, ¶ 22; *In re W.H.*, 3d Dist. Marion No. 9-16-19, 2016-Ohio-8206, ¶ 79; *In re J.C.*, 4th Dist. Adams No. 07CA833, 2007-Ohio-3781, ¶ 13.

{¶82} In this case, it should be emphasized that Jenna Wasserman was the initial GAL for both children for in excess of a year. She conducted significant investigations, participated in hearings, and filed multiple reports (at least five during her tenure), which detailed her interactions with the parents, the children, service providers, therapists and caseworkers. GAL Wasserman consistently updated her reports as new issues became apparent and as the parents either made

progress, cooperated, or failed to cooperate throughout the matter. Her reports were thorough and expressed her views and reservations on the potential reunification of children with their parents when the long-term care plan was proposed in 2017, though she was willing to go along with the plan due to safety measures and recommendations of H.M.'s therapist. However, once GAL Wasserman was made aware of new disclosures from H.M., she was absolutely against the long-term reunification plan.

{¶83} Near the end of 2017, GAL Wasserman had to withdraw from the case due to taking a new legal position. After that, the trial court appointed CASA/GAL Blank and GAL French for the children. Both CASA/GAL Blank and GAL French filed initial reports in the matter. CASA/GAL Blank's initial report indicated that he had contacted twelve individuals and reviewed numerous records. GAL French's initial report indicated that he communicated with former GAL Wasserman about the case, that he met with S.M., H.M., the foster parents, Joel, and with LCCS case workers.

{¶84} GAL French indicated at the final hearing that rather than be overly duplicative in their work, CASA/GAL Blank focused on the family affairs while GAL French focused on the financial aspects, particularly with regard to information on S.M.'s trust, of which little was known for certain.[7] GAL French

---

[7] Joel had specifically not wanted to know how much money was in the trust, and thus little information was known about it until the GAL specifically inquired and requested records.

felt it was better to divide their duties. Once LCCS filed its motion for permanent custody, CASA/GAL Blank filed a final report summarizing his involvement in this matter in nine single-spaced pages. In the end, CASA/GAL Blank recommended that permanent custody of S.M. and H.M. be granted to LCCS. GAL French filed a handwritten "supplemental" report concurring with what CASA/GAL Blank had recommended. GAL French testified at the final hearing that he felt there was no need for a second report stating exactly the same, particularly where his work was focused on other issues. GAL French also handled making the legal filings on behalf of the GALs because CASA/GAL Blank was not an attorney.

{¶85} Both CASA/GAL Blank and GAL French testified at the final hearing. GAL French also presented the testimony of the administrator of S.M.'s trust, providing the trial court with information about where funds had been used previously and how much was available.[8]

{¶86} Now, on appeal, both Rachel and Joel argue that CASA/GAL Blank and GAL French failed to conduct a significant enough investigation in this matter and that they failed to prepare sufficient reports. Rachel and Joel also argue that the GALs failed to observe them interact with the children. Rachel and Joel argue that the GALs were derelict in their duties under R.C. 2151.281(I) and Sup.R. 48.

---

[8] Testimony indicated that despite what had been used from the trust, it had only grown in value, and that it could easily outlast S.M.'s lifetime needs.

**{¶87}** At the final hearing, CASA/GAL Blank explained that he did not observe Joel or Rachel interact with their children because he wanted to give them more privacy during their limited visitation time and because the visitations were already being observed by staff at Adriel. GAL French testified that he left these issues primarily up to CASA/GAL Blank, thus he similarly did not observe Joel or Rachel interact with their children.

**{¶88}** In its entries granting permanent custody of the children to LCCS, the trial court addressed objections that were made by the appellants to both GAL French's handwritten report and to the GALs' failure to observe the children's interactions with their parents. Notably, the trial court found that the GALs *did* violate their duties under Ohio Rule of Superintendence 48. However, the trial court found that despite the violation on the part of the GALs, the reports

> **tendered throughout the case reflect that their respective reports are anything but superficial. The records maintained in the case file reflect that both GALs worked diligently on both cases. The reports reflect that the actions of the GALs cannot be described as "bare bones" investigations by any means. Although both GALs failed to observe the interactions between the parents and both daughters, this failure does not taint the other findings and recommendations. The Court received details from healthcare professionals, foster mother and LCCS workers regarding the interactions between the girls and their parents. The Court Finds that the two GALs substantially complied with their duties in this case.**

(Doc. No. 260; Doc. No. 194).

**{¶89}** In our own review of the matter, we cannot find that the trial court erred, particularly where we have held that the Superintendence Rules do not create substantive rights. The Rules are used for guidance, but even if they were binding, the trial court thoroughly and thoughtfully addressed the issue, and we can find no reversible error here. This is especially true given the trial court's statement that it was able to receive information regarding interactions between the parents and their children from other sources, which would include the prior GAL and all her reports. Therefore, we cannot find that appellants have demonstrated any prejudice in this matter. For these reasons, Rachel's fifth assignment of error and Joel's fourth assignment of error are overruled.

*Rachel's Sixth Assignment of Error*;
*Joel's Fifth Assignment of Error*

**{¶90}** In Rachel's sixth assignment of error, and in Joel's fifth assignment of error, they argue that the trial court violated their religious freedom when it allowed LCCS to use "certain religious traditions" of the parents as reasons to not reunify the children with them. More specifically, Rachel argues that LCCS "continually imposed its definition of what is an appropriate relationship for a husband and wife, and it does not include a wife who, through her faith and tradition, delegates most of the family responsibilities to her husband." (Rachel's Appt. Br. at 21). Joel argues that LCCS improperly equated their religious family structure to abuse, and that the trial court equated the beliefs with mental health issues.

Standard of Review

**{¶91}** Ohio has long followed the rationale of *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526 (1972), and other United States Supreme Court precedent regarding balancing the government's interest and the individual's right to freely exercise his religion. *See e.g.*, *State v. Whisner*, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976). In order to determine whether the government has impermissibly infringed upon a person's free exercise of religion, a three-part test is applied: (1) are the religious beliefs truly held, (2) has the government infringed upon the person's constitutional right to the free exercise of religion, and (3) if the first and second questions are answered affirmatively, has the state demonstrated a compelling interest for its infringement which is done in the least restrictive means. *State v. Schmidt*, 29 Ohio St.3d 32, 34, 505 N.E.2d 627 (1987); *In re Z.S.*, 3d Dist. Defiance No. 4-09-20, 2010-Ohio-1929, ¶ 95.

Analysis

**{¶92}** In analyzing this issue on appeal, we must begin by noting that while the record is clear that Joel and Rachel were "religious," it is far less clear as to what their religious beliefs were. There are some references in the record that Joel and Rachel may have been associated with the Pentecostal church. However, Joel's brief states that they are actually "New Order Amish." Regardless of the title, there are plenty of references to the appellants having more "traditional" views on

husband as a breadwinner and wife as a homemaker, but the record is scant on defining the parents' actual religious beliefs. This is particularly true given that neither parent elected to testify to further define these issues. Nevertheless, in the interests of justice, we will assume that the parents' religious beliefs were sincerely held, as there is no indication to the contrary, and we will also assume that their religious beliefs were defined enough to merit further examination.

{¶93} Even with these assumptions, we still cannot find that LCCS or the trial court infringed upon appellants' rights to free exercise of religion in this matter. At the inception of S.M.'s case, Rachel did not drive or have access to transportation. Because of this, S.M. was missing appointments that could cause long-term irreparable damage to her development. In addition, with S.M. missing appointments, Rachel was also not present to learn that she should not be feeding her child baby food, especially in the reclined position that S.M. was placed in. Moreover, Rachel also had no access to money. Rachel expressed to caseworkers and mental health professionals that she did not feel like an equal partner in the marriage, and she essentially indicated that these things made it difficult to care for a special needs child adequately.

{¶94} In response to these issues, LCCS set case goals to make Rachel a more equal partner in the marriage, to get her access to money and make her mobile—not in some apparent attempt to fashion her into a "modern" woman away

from her religion, but to insure that she could care for her special needs child in the event that she needed to make it to appointments or needed help when Joel was not around. Nothing in the record suggests that LCCS wanted appellants to give up their religious beliefs, or for Rachel to stop being a homemaker. To the contrary, H.M. was actually specifically placed in faith-based foster care due to her religious upbringing.

{¶95} Furthermore, a potentially major issue arose involving appellants' "religious" beliefs when H.M. made her disclosures to her parents about the alleged sexual assaults perpetrated by her brothers. Rather than seek any treatment for the matter, the family merely "prayed" over it to have the boys stop, leaving the girls in the home with them. Protecting the girls from sexual assault would certainly represent a compelling government interest.

{¶96} In its judgment entries, the trial court made a reference to Joel's religion, stating as follows.

> **[Joel] simply cannot provide and meet[] the general and individual needs of each daughter. Father's mental health issues, *combined with his reliance on faith*; resistance to consider the advice of health care providers; inability to cope with reported abuse among his children; distrust of government – interferes with his amenability to accept that his perception of the world is unhealthy and prevents him from receiving the help that has been offered.**

(Emphasis added.) (Doc. No. 260; Doc. No. 194). While the trial court referenced Joel's faith, it was only in passing. In addition, Joel's reliance on faith alone to

correct sexual assault could appropriately have been viewed negatively by the trial court.

{¶97} After reviewing the record, we cannot find that there is enough evidence that LCCS, or the trial court for that matter, infringed on appellants' religious rights. Even assuming there was some intrusion, it would still be warranted in this instance to whatever minimal extent it was done. Thus we cannot find that there was error in this case, let alone reversible error. For these reasons, Rachel's sixth assignment of error and Joel's fifth assignment of error are overruled.

*Rachel's Third Assignment of Error*

{¶98} In Rachel's third assignment of error, she argues that the trial court erred by denying motions to dismiss LCCS's permanent custody motions that were made on the fourth day of the permanent custody hearing. At that time, Joel's attorney filed motions to dismiss, contending that the cases had not been completed within the two year "Sunset Date" wherein an agency had to take action, even though LCCS had already filed its motions for permanent custody in the case of both girls and was proceeding on those motions. Rachel's attorney orally joined the motions to dismiss. They contended that the entire cases had to be completed within two years. The motions were denied by the trial court.

{¶99} On appeal, Rachel renews the argument, claiming that pursuant to *In re Young*, 76 Ohio St.3d 632 (1996), these permanent custody cases were not

completed before the "Sunset Date." The "Sunset Date" is the date upon which temporary custody is terminated when there is no motion filed pursuant to R.C. 2151.415(A). However, *In re Young*, which Rachel uses as support for her argument, dealt with a situation where an agency *had not even filed a permanent custody motion at all* prior to the "Sunset Date," thus it is wholly inapplicable here where there were timely filed motions.

{¶100} In this case, LCCS timely filed its permanent custody motions (the parties did not even dispute this issue when arguing the motions to dismiss), the matter proceeded to the final hearing within the 120 days as required by statute (though the fifth day of the final hearing was finished slightly after the 120 days due to scheduling issues amongst all of the parties). *See* R.C. 2151.414(A)(2) ("The court shall hold the hearing scheduled pursuant to division (A)(1) of this section not later than one hundred twenty days after the agency files the motion for permanent custody, except that, for good cause shown, the court may continue the hearing for a reasonable period of time beyond the one-hundred-twenty-day deadline. The court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion.").

**{¶101}** Under these circumstances we cannot find that the trial court erred given that Rachel has shown us no compelling authority to the contrary. Therefore, Rachel's third assignment of error is overruled.

*Rachel's Seventh Assignment of Error*

**{¶102}** In Rachel's seventh assignment of error, she argues that she was deprived of effective assistance of counsel at the permanent custody hearing. More specifically, she argues that her third and final attorney in this matter was appointed a "mere" two months prior to the first day of testimony in the permanent custody hearing. She contends that it was not enough time to prepare. In addition, Rachel argues that her attorney failed to effectively cross-examine witnesses, leaving the bulk of cross-examination to Joel's attorney, who had his own agenda separate from Rachel.

Standard of Review

**{¶103}** "In permanent custody proceedings, where parents face losing their children, we apply the same test as the test for ineffective assistance of counsel in criminal cases." *In re E.C.*, 3d Dist. Hancock No. 5-15-01, 2015-Ohio-2211, ¶ 40. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *In re C.N.*, 3d Dist. Hardin Nos. 6-17-16 and 6-17-23, 2018-Ohio-2442, ¶ 16,

quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If the petitioner cannot prove one of these elements, "it [is] unnecessary for a court to consider the other prong of the test." *State v. Walker*, 3d Dist. Seneca No. 13-15-42, 2016-Ohio-3499, ¶ 20.

**{¶104}** "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2d Dist. Montgomery No. 26359, 2015-Ohio-2553, ¶ 56, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

**{¶105}** As for deficient performance, a petitioner needs to show that the deficient performance prejudiced the appellant. *Strickland* at 687. "To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Conway* at ¶ 95.

Analysis

**{¶106}** In this case, Rachel makes several bald arguments asserting her counsel was ineffective without remotely showing how she was prejudiced. For example, she complains that when Joel's attorney lodged objections to certain

documents, reports, or testimony presented at the final hearing, Rachel's attorney merely concurred rather than crafting an additional argument. Given that some of the motions or objections lodged were granted, it would not seem there was any prejudice. Moreover, it could be readily seen as strategic not to repeat arguments of another counsel when the final permanent custody hearing was already five days long, held over multiple months. Thus Rachel's argument is not well-taken.

{¶107} Rachel also claims that her attorney could not have had enough time to prepare for such a complex case in only two months. However, there is no indication that her attorney was unprepared; it is simply pure speculation. Moreover, even if her attorney somehow was not fully prepared by the first hearing, the attorney had additional time before each next phase of the hearing to prepare. The record is wholly devoid of evidence of counsel being unprepared or of there being a direct resulting prejudice from it.

{¶108} Next, Rachel argues that her counsel failed to appropriately cross-examine H.M. to more fully develop the relationship between H.M. and her mother. However it was clear from the testimony that H.M. loved her mother but she did not feel protected. Rachel herself made statements that she did not feel like she could protect her children. Therefore we fail to see any error here, or any resulting prejudice.

{¶109} Finally, Rachel argues that her attorney failed to develop a record regarding Rachel's health issues, such as the impact her surgeries had on her ability to actively work the case plan. Again, the record is devoid of information as to how this would help her or how it would change the outcome of the case. Notably, Rachel and Joel elected not to testify, perhaps because there were pending charges against their boys and they did not want to have to address any of their actions regarding those issues. We will not second guess counsel who is presumed to be competent on these issues. In addition, some of Rachel's health issues were presented through various counselors and evaluators, thus the trial court was aware. Therefore, this argument is also not well-taken.

{¶110} Reviewing Rachel's assignment of error in its entirety, she is unable to show how her counsel was deficient or how she was directly prejudiced by any of the purported deficiencies. Therefore, her seventh assignment of error is overruled.

*Conclusion*

{¶111} For the foregoing reasons, Rachel and Joel's assignments of error are overruled and the judgments of the Logan County Common Pleas Court, Juvenile Division, awarding permanent custody of S.M. and H.M. to LCCS are affirmed.

***Judgments Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**