[Cite as *In re B.M.*, 2023-Ohio-4088.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

IN RE:

    B.M.,

ADJUDGED DEPENDENT CHILD.

[KRYSTA J. - APPELLANT]

CASE NO. 8-23-03

O P I N I O N

IN RE:

    G.J.,

ADJUDGED DEPENDENT CHILD.

[KRYSTA J. - APPELLANT]
[JORRELL J. - APPELLANT]

CASE NO. 8-23-04

O P I N I O N

**Appeals from Logan County Common Pleas Court**
**Family Court Division**
**Trial Court No. 20-CS-0024(A) and 20-CS-0024(B)**

**Judgments Affirmed**

**Date of Decision: November 13, 2023**

APPEARANCES:

    *Autumn D. Adams* for Appellants

    *Evan R. Downing* for Appellee

Case Nos. 8-23-03 and 8-23-04

**WALDICK, J.**

{¶1} In Case Number 8-23-03, mother-appellant, Krysta J. ("Krysta), appeals the March 8, 2023 judgment of the Logan County Common Pleas Court, Family Court Division, granting permanent custody of her child B.M. to the appellee, Logan County Children's Services agency ("LCCS" or "the agency"). On appeal, Krysta argues that the trial court's decision granting permanent custody to the agency was against the manifest weight of the evidence.

{¶2} In Case Number 8-23-04, Krysta and her now husband, Jorrell J. ("Jorrell"), each appeal the March 8, 2023 judgment of the Logan County Common Pleas Court, Family Court Division, granting permanent custody of their child, G.J., to the appellee, LCCS. On appeal, Krysta and Jorrell argue that the trial court's decision granting permanent custody to the agency was against the manifest weight of the evidence.

{¶3} For the reasons that follow, we affirm the judgment of the trial court in both cases, which have been consolidated by this Court for purposes of briefing and argument on appeal.

*Background*

{¶4} In mid-2018, B.M., a female, was born to unwed parents, Krysta and Austin M. ("Austin").[1]

---

[1] Austin was served notice and was appointed counsel in the initial proceedings below involving B.M., but was ultimately removed from the LCCS case plan at his request. Through Austin's counsel, the trial court was subsequently advised that Austin wished no further involvement in the case involving B.M.

{¶5} In early 2020, G.J., also a female, was born to Krysta and Jorrell, who were unwed at the time.[2]

{¶6} On April 9, 2020, LCCS filed complaints in the Family Court Division of the Logan County Court of Common Pleas, alleging that B.M. and G.J. were dependent children. Specifically, the complaints alleged that the two children were living with Krysta and Jorrell and that a "referent source" had reported that Jorrell had recently beaten Krysta. It was further alleged that Jorrell had been arrested two to three months before for another domestic violence incident where Krysta was the victim, and that Jorrell had also been arrested the month before on cocaine charges. The complaints stated that on April 2, 2020, an LCCS investigator conducted a home visit and observed Krysta to have a cut on her forehead, which Krysta stated was from running into a door; however, Krysta and Jorrell admitted a domestic violence incident had occurred between them a few months prior. The complaints alleged that a close family member of Krysta's refuted Krysta's and Jorrell's denial of any more recent domestic violence. The complaints stated that on April 7, 2020, a second home visit was conducted by LCCS and Krysta was observed to have a bruise around her eye, which Krysta claimed was from being head-butted by one of the children. That home visit ended when Krysta became extremely agitated and kicked the agency investigator out of the home. The complaints further alleged that

---

[2]Krysta and Jorrell subsequently married in January of 2021.

Jorrell was indicted in September of 2019 for domestic violence, a third-degree felony based on the fact he had two prior convictions for the same crime. The complaints stated that Jorrell was arraigned on that indictment on March 13, 2020 and ordered as a condition of his bond to have no contact with Krysta. Finally, the complaints noted that Krysta had a long history with LCCS and stated that B.M. had been previously removed from Krysta's care and placed in foster care, based on the agency's ongoing concerns with Krysta's mental health, her marijuana use, and her involvement in two relationships where domestic violence was an issue with the fathers of her children. The complaints noted that G.J. had been born during the pendency of B.M.'s prior children's services case but G.J. was not removed from her mother's care because Krysta was doing well in complying with the case plan at that time. Finally, the complaints noted that B.M.'s prior case had been closed in early 2020 and B.M. had been returned to Krysta, as Krysta had satisfactorily completed the case plan in that case.

{¶7} In the instant cases, on April 10, 2020, the trial court granted the agency's motion for emergency temporary custody of the two children.

{¶8} On May 8, 2020, the agency filed a proposed case plan relating to both children.

{¶9} On May 21, 2020, an adjudicatory hearing was held. As reflected by judgment entry filed on June 8, 2020, the parties stipulated at the hearing that B.M. and G.J. were dependent children pursuant to R.C. 2151.04(C).

{¶10} On July 6, 2020, a dispositional hearing was held and, by judgment entry filed August 19, 2020, LCCS was ordered to be maintained as the temporary custodian of the two children. In that entry, the court also approved the case plan filed by the agency on May 8, 2020.

{¶11} Subsequent progress review documents filed by LCCS with the trial court reflected that both Krystal and Jorrell continued to make "insufficient progress" toward addressing the agency's concerns in the cases.

{¶12} On December 29, 2020, LCCS filed a motion seeking permanent custody of B.M., alleging that B.M. had been in the temporary custody of the agency for twelve or more months of a consecutive 22-month period and that it would be in the best interest of the child for permanent custody to be granted to LCCS.

{¶13} On September 23, 2021, LCCS filed a motion seeking permanent custody of G.J., alleging that G.J. had been in the temporary custody of the agency for twelve or more months of a consecutive 22-month period and that it would be in the best interest of the child for permanent custody to be granted to LCCS.

{¶14} In both cases, a multi-part permanent custody hearing was held on 10 different dates between March 18, 2022 and November 1, 2022.

{¶15} On March 8, 2023, the trial court filed a lengthy judgment entry in which the court reviewed the record of the cases and summarized the evidence presented at the multi-day permanent custody hearing. After conducting that

review, and making findings of fact based on the evidence presented, the trial court found that both children had been in the agency's custody for twelve or more months of a consecutive 22-month period, that neither child could be placed with a parent within a reasonable period of time, and that it was in the best interest of both children that LCCS be granted permanent custody of the two children. For those reasons, the trial court granted the agency's motion for permanent custody in both cases, and terminated the parental rights of Krysta and Austin as to B.M., and of Krysta and Jorrell as to G.J.

{¶16} On March 9, 2023, Krysta filed appeals in both cases. On March 14, 2023, Jorrell filed an appeal in the case involving G.J.

{¶17} By subsequent order of this Court, the appeals in both cases were consolidated, and Krysta and Jorrell have opted to file a joint merit brief relating to both cases.

**Assignment of Error**

**It was against the manifest weight of the evidence for the Trial Court to grant LCCS' motion for permanent custody.**

*Analysis*

{¶18} "[T]he right to raise one's children is an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management

of their children." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested." *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 6.

{¶19} "Decisions concerning child custody matters lie within the sound discretion of the trial court and will not be reversed unless the trial court abused its discretion." *In re Leveck*, *supra*, ¶ 7, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). An abuse of discretion involves more than a mere error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "In reviewing this exercise of discretion, appellate courts must adhere to 'every reasonable presumption in favor of the lower court's judgment and finding of facts.'" *In re Leveck*, *supra*, at ¶ 7, quoting *In re Brodbeck*, 97 Ohio App.3d 652, 659, 647 N.E.2d 240 (1994).

{¶20} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for

permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. Specifically, "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

**{¶21}** "The first prong of that test requires a finding by clear and convincing evidence that one of the statutorily-prescribed situations of R.C. 2151.414(B)(1) is satisfied." *In re N.F.*, 3d Dist. Marion No. 9-22-40, 2023-Ohio-566, ¶ 19. In that respect, R.C. 2151.414 provides:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's parents.

(b)   The child is abandoned.

(c)   The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e)   The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶22} Then, in determining the best interest of the child, R.C. 2151.414(D) directs the trial court to consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶23} Pursuant to R.C. 2151.414(B)(1), an award of permanent custody must be based on clear and convincing evidence. *In re H.M.* 3d Dist. Logan No. 8-18-46, 2019-Ohio-3721, ¶ 44. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477.

{¶24} In reviewing whether a trial court's permanent custody decision is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment]

must be reversed and a new trial ordered.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001). Furthermore, "'[w]eight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier-of-fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."'" (Emphasis *sic*.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed. 1990).

{¶25} Finally, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier-of-fact. *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis *sic*.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). "'Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence.'" *In re A.B.*, 3d Dist. Marion No. 9-22-

12, 2022-Ohio-4234, ¶ 12, quoting *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶26} In the instant case, with regard to the first prong of the two-prong test, the trial court found by clear and convincing evidence that both children had been in the agency's temporary custody for twelve or more months of a consecutive 22-month period. Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive 22-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 3d Dist. Marion Nos. 9-13–43, 9–13–44, and 9-13-45, 2014-Ohio-1136, ¶ 30, citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14.

{¶27} On appeal, Krysta and Jorrell do not dispute that LCCS satisfied the R.C. 2151.414(B)(1)(d) "12 in 22 standard" as to both children, a finding which is also supported by the record. Therefore, we move on to consider whether the trial court's best-interest of the child finding is also supported by clear and convincing evidence.

{¶28} In its written decision, the trial court reviewed the evidence presented at the permanent custody hearing in light of the best-interest analysis required by R.C. 2151.414(D) and made comprehensive findings of fact based on that evidence.

**{¶29}** As an initial matter, the trial court accurately noted that the issues in the cases "have been essentially the same since 2018, to wit: domestic violence with the mother usually being the victim; use of illicit substances; and the state of the mother's mental health." (Journal Entry of Judgment, Docket No. 376, Page 7).

**{¶30}** As the trial court then noted, the evidence established that since the dependency complaints relating to B.M. and G.J. were filed on April 8, 2020, at least 45 police reports had been made that involved Krysta and/or Jorrell. The trial court detailed the evidence relating to several of those police reports, which included (1) Krysta violating a civil protection order ("CPO") that a third-party had against Krysta; (2) Krysta refusing to return her six-year-old son to his legal custodians after visitation with Krysta; (3) Krysta screaming and acting in an unruly manner in the Bellefontaine Police Department lobby, which resulted in Krysta being convicted of disorderly conduct; (4) Krysta becoming involved in a verbal altercation with the former judge on the case, Judge Kellogg-Martin, during a prior court proceeding in the case, with Krysta storming out of the courtroom while Judge Kellogg-Martin was speaking; (5) Jorrell calling the police for assistance because Krysta would not leave him alone after he had broken up with her, and Krysta was threatening Jorrell with a car; (6) an incident where the agency caseworker observed Krysta and another woman yelling and screaming at each other on the street; (7) a neighbor reporting that Krysta and Jorrell were in a domestic dispute and that Jorrell had locked Krysta out of her home; and (8) an incident where Krysta was alleged to have

threatened others with a gun, although no firearm was subsequently located. Additionally, following the incident where Jorrell called the police because Krysta would not leave him alone, the trial court noted that Krysta presented herself at the hospital emergency room the day following that incident with a variety of injuries and then appeared in court a few days later with a noticeable black eye.

{¶31} The trial court further noted that, while Krysta testified she had only once been the victim of domestic violence on Jorrell's part, being a 2019 incident for which Jorrell was subsequently charged and convicted of domestic violence, Krysta nonetheless obtained a civil protection order against Jorrell on September 16, 2020 and, in the petition for that CPO, Krysta stated that Jorrell had "physically and mentally abused her for two years."

{¶32} Based on that and other evidence, the trial court found:

**[T]he mother has continually exposed herself to a potentially dangerous person, to wit: Jorrell * * *, who has a pattern/history of domestic violence or otherwise incriminating behaviors and who has not remedied those behaviors. Further, the mother herself has engaged in many incriminating and/or illegal activities. The Court finds that the relationship between the mother and Jorrell * * * , during the pendency of these cases, continued to be volatile, dangerous and unpredictable for both of them.**

(Journal Entry of Judgment, Docket No. 376, Page 10).

{¶33} As to Krysta's mental health, the trial court found that Krysta had ongoing mental health issues, having been diagnosed with generalized anxiety disorder, major depressive disorder, psychophysiological insomnia, and post-

-14-

traumatic stress disorder.  While Krysta had been in treatment with a mental health counselor since late 2018, she had also missed a number of sessions.  That counselor testified at the permanent custody hearing that Krysta had made progress with her counseling and successfully completed the same; however, the counselor also acknowledged that Krysta did not disclose anything about the domestic violence concerns to the counselor.  That same counselor subsequently began seeing Jorrell individually, and also seeing Krysta and Jorrell as a couple for marriage counseling, but yet again both Krysta and Jorrell failed to disclose to the counselor that domestic violence was an issue between them.  Krysta had also been prescribed medication by a psychiatrist, who did not testify at the hearing, and Krysta admitted that she had not been compliant with the medication prescribed by the psychiatrist.

{¶34} As found by the trial court, the evidence further established that throughout the pendency of the cases, Krysta continually tested positive for THC, notwithstanding the agency caseworker having repeatedly expressed to Krysta that the case plan required Krysta to refrain from using drugs with mind-altering effects, including marijuana. While Krysta obtained a medical marijuana card in October of 2021, the trial court noted that Krysta appeared to have been less than honest about her drug usage, and failed to inform her mental health counselor of her drug use. Krysta also failed to provide her agency caseworker with information relating to Krysta's marijuana use that would have permitted the case worker to assist Krysta in addressing the agency's concerns on that issue.

{¶35} With regard to Jorrell, the trial court accurately noted in its written decision that the case plan required that Jorrell meet with a licensed counselor to complete a mental health and substance abuse assessment, and to discuss potential services for anger management, domestic violence counseling, and substance abuse issues; refrain from using illegal substances; maintain housing for himself and his child; not engage in illegal activities; display an understanding of domestic violence and its impact on the family; and show healthy relationship coping skills. The record reflects that Jorrell failed to meet most of those requirements.

{¶36} While the agency caseworker attempted to work with Jorrell from the time the case involving his daughter was opened, it was eight months before Jorrell involved himself with the agency in any meaningful way. After the case involving G.J. was filed and the child was placed in foster-care, Jorrell visited with G.J. on multiple occasions during the first 11 months, but also missed a number of other visitations. While Jorrell was referred by the agency to services for mental health, employment assistance, housing assistance, and drug counseling, Jorrell did not engage in counseling services until nearly a year after the case was filed. As to his ability to provide housing and other necessities for his child, Jorrell testified that he was employed as a construction worker by his uncle, but Jorrell was unable to formally confirm that employment and had no income documentation, as Jorrell claimed to always be paid in cash. Jorrell's testimony about the hours he worked and the regularity of his employment was inconsistent and vague. Jorrell testified

that he has eight children and that he takes care of all of them, but the evidence reflected that he had been found in contempt of court for failure to pay child support and for failing to appear at child support hearings.  Jorrell did complete a domestic violence program as a condition of community control in his criminal case, but engaged in no such counseling as it related to the cases here.  Like Krysta, Jorrell obtained a medical marijuana card in the fall of 2021.  However, as the trial court noted, Jorrell testified that his preferred method of using marijuana is smoking, which is a form of use prohibited under Ohio's medical marijuana laws.  Like Krysta, Jorrell also continued to use marijuana regularly, notwithstanding the fact that the caseworker requested Jorrell refrain from the use of mind-altering drugs for the same reasons that had been communicated to Krysta.  Jorrell, like Krysta, never requested that the case plan be amended to permit medical marijuana usage.

{¶37} As to both parents involved in these cases, an issue of additional concern to the trial court was that Jorrell was convicted of domestic violence relating to a September 2019 incident where Krysta was the victim.  It was reported that at the time of the incident, Krysta was pregnant with G.J. and was holding B.M. in her arms.  As a result of being charged in that case, Jorrell had an active no-contact order with regard to Krysta from September 10, 2019 until November 19, 2020; however, there were numerous reports and examples of Jorrell having contact with Krysta during that timeframe.  The evidence further established that Jorrell has an extensive criminal history, including multiple domestic violence convictions and a

felony conviction in 2020 for possession of cocaine that occurred in 2019. Jorrell testified that he had previously been diagnosed with anger issues, PTSD, and schizophrenia, but Jorrell did not successfully complete his mental health counseling as required by the case plan.

{¶38} In the written permanent custody decision in these cases, the trial judge accurately observed that it was the court's responsibility to determine the credibility of the witnesses. The trial court noted it had concerns about the honesty of both Krysta and Jorrell with regard to key matters in the cases. The trial court then went on to make very extensive findings about a number of issues on which Krysta and Jorrell did not seem credible, and why. The trial court ultimately found that, based on all of the evidence, the two parents had chosen to continue to associate with each other knowing that the other had a history of negative and even criminal behaviors that had not been adequately addressed, even though doing so was detrimental to achieving reunification with the children.

{¶39} As to the two children themselves, the trial court noted that B.M. was reported to be a calm and loving child. She was well bonded with her foster parents, whose home was practically the only one she had ever known, and was the home in which she had learned to walk, talk, and had reached other developmental milestones. There was also evidence that B.M. was a different child when she returned from visitations with Krysta, and would begin biting and hitting another child in the home after those visits. B.M.'s foster parents were foster-to-adopt

parents who had expressed an interest in adopting B.M. G.J. was reported to be well bonded with her foster parents as well, whose home the child had lived in since she was three months old. G.J. was described as a strong-willed little girl. As the trial court accurately noted, the evidence established that both children were healthy and developmentally on target, living in stable and safe environments, where all needs were being met by the respective sets of foster parents. The record further reflects that the agency had investigated relative-placement for both children but found no family members or other such persons available who were both willing to take the children and who were in compliance with the requisite placement standards.

{¶40} Finally, the guardian ad litem of B.M. and G.J. filed a detailed report and testified at the hearing that granting the agency's motions for permanent custody would be in the best interest of the children.

{¶41} Following our own thorough review of the record, we find that those factual determinations made by the trial court are more than adequately supported by the evidence presented throughout the permanent custody hearing proceedings. Further, the facts outlined by the trial court in its written decision constitute clear and convincing evidence upon which the trial court reasonably relied in determining that the children's best interests required that Krysta's parental rights should be permanently terminated as to B.M. and that both Krysta's and Jorrell's parental rights should be permanently terminated as to G.J. Both parents failed to comply

with or complete the case plan in significant ways, and both parents appeared to continually prioritize their own personal desires, individually and as a couple, over any desire to have the children returned to them in a suitable home environment.

{¶42} On appeal, however, Krysta and Jorrell assert that the domestic violence concerns were overstated, particularly as the two of them denied any ongoing domestic violence issues; they claim that the substance abuse concerns were a "manufactured distraction" because both Krysta and Jorrell had medical marijuana permits; and they argue that the mental health issues had been satisfactorily addressed through counseling. Krysta and Jorrell further argue that the trial court did not give adequate weight to evidence that Krysta was gainfully employed, had maintained appropriate housing for the children, and was able to adequately support the children financially.

{¶43} With regard to the argument relating to the domestic violence concerns, we have already found that the record supports the trial court's findings of fact relating to the domestic violence issues, both past and ongoing, between Jorrell and Krysta. While both Jorrell and Krysta testified that only a single domestic violence incident had ever occurred between them, the trial court found that testimony not credible in light of other evidence presented. Both parents also repeatedly demonstrated a lack of insight as to the significance of their domestic

violence history and displayed a lack of concern about the manner in which the children could be impacted by those issues.

**{¶44}** Regarding the use of marijuana by Krysta and Jorrell, it is true that the record reflects both parents obtained medical marijuana cards during the pendency of the permanent custody proceedings. Krysta and Jorrell essentially assert that because their marijuana use after that point was legal under Ohio law, the marijuana usage should not be held against them in these cases. Krysta and Jorrell also argue that marijuana use, legal or not, is not a sufficient basis upon which to terminate parental rights, particularly in the absence of specific evidence that marijuana use affected the parenting of the children involved.

**{¶45}** In response to the arguments concerning marijuana, we note that the termination of the parental rights here was not based solely on Krysta and Jorrell's marijuana use. The main concerns in these cases also involved significant mental health issues as to both parents and a history of domestic violence. Because these issues were not satisfactorily addressed by either parent, there was a significant impact to the stability of the home and great risk to the emotional health of the children. Given the background of Krysta and Jorrell's struggle with mental health and the demonstrated history of their volatile, sometimes violent, relationship, the case plan's prohibition of marijuana usage – legal or otherwise – was not an unreasonable restriction. Notwithstanding that fact, instead of working with the agency to find alternatives to marijuana use or to demonstrate that the couple's use

of marijuana was, in fact, medically necessary and that no legitimate alternative treatments were available, both Krysta and Jorrell chose to ignore the agency's concerns about marijuana usage and, instead, simply continued their indiscriminate use of marijuana in violation of the case plan.

{¶46} Finally, we note that the evidence did establish that Krysta (although not Jorrell) was gainfully employed, had maintained appropriate housing for the children, and was able to financially support them. However, while Krysta's success in those respects is laudable, the children's best interests here demand more than simply providing housing and food.

{¶47} Thus, upon considering all relevant factors and remaining mindful that the trial court's judgment may have been based upon observing the demeanor of witnesses and other nuances that do not translate to the written record, we find that the trial court's decision regarding permanent custody as to both children was supported by clear and convincing evidence and, in particular, the trial court did not err in determining that it was in the best interest of B.M. and G.J. to grant permanent custody to the agency.

{¶48} Both parents had an ongoing history of erratic, confrontational and volatile behavior; both parents demonstrated an inability to conduct themselves in compliance with simple guidelines and rules of law; and both parents displayed a determination to use a mind-altering controlled substance on a regular basis, notwithstanding the fact that to do so was in direct contravention of the case plan

objectives. Despite the long history of agency involvement, both Krystal and Jorrell failed to put key principles of the reunification plan into practice; failed to appreciate the severity of their abusive relationship and the negative impact such a relationship has upon children in the same household; and failed to demonstrate an adequate understanding of goals of the mental health and domestic violence counseling to which they were referred.

{¶49} Accordingly, for all of the reasons highlighted throughout this opinion, we are unable to find that the trial court's decision to grant the motions for permanent custody was against the manifest weight of the evidence as to either Krysta or Jorrell.

{¶50} The assignment of error raised by Krysta in both cases and by Jorrell in the case involving G.J. is therefore overruled.

### Conclusion

{¶51} In Case Number 8-23-03, relating to the minor child B.M., having found no error prejudicial to the mother-appellant, Krysta J., in the particulars assigned and argued, the judgment of the Logan County Common Pleas Court, Family Court Division, is affirmed.

{¶52} In Case Number 8-23-04, relating to the minor child G.J., having found no error prejudicial to the mother-appellant, Krysta J., and also having found no error prejudicial to the father-appellant, Jorrell J., in the particulars assigned and

Case Nos. 8-23-03 and 8-23-04

argued, the judgment of the Logan County Common Pleas Court, Family Court Division, is affirmed.

**_Judgments Affirmed_**

**MILLER, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**