[Cite as *In re A.C.*, 2026-Ohio-1926.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

IN RE:

   A.C.,

**CASE NO. 4-25-17**

ADJUDICATED DEPENDENT
CHILD.

**OPINION AND
JUDGMENT ENTRY**

[SHYMARIOUS C. - APPELLANT]
[DORIAN S. - APPELLANT]

Appeal from Defiance County Common Pleas Court
Juvenile Division
Trial Court No. 36010

**Judgment Affirmed**

**Date of Decision: May 26, 2026**

APPEARANCES:

   *Timothy C. Holtsberry* **for Appellant Dorian S.**

   *Autumn D. Adams* **for Appellant Shymarious C.**

   *Chelsea R. Cereghin* **for Appellee**

**WALDICK, J.**

{¶1} Mother-appellant, S.C. ("Mother"), and Father-appellant, D.S. ("Father"), bring this appeal from the October 3, 2025 judgment of the Defiance County Common Pleas Court, Juvenile Division, granting permanent custody of the minor child, A.C., to the Defiance/Paulding Consolidated Job and Family Services Department ("DCJFS"). For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} In September of 2021, Mother was 16 years old and she worked part-time as a cashier at a grocery store in Madison, Georgia. At the time, Father was 50 years old and he met Mother for the first time in her checkout line. Father spoke with Mother and gave Mother his business card. Mother indicated she was in a "really bad place" when she met Father and that she reached out to Father after their first meeting.

{¶3} Shortly after meeting, Mother and Father began a tumultuous romantic/sexual relationship. Within three weeks of meeting, Father wanted to get Mother emancipated. Before long, Mother and Father moved to Michigan and lived there together until Mother attempted to leave Father in August of 2022.

{¶4} In August of 2022, Mother called a support hotline seeking to end her relationship with Father. Michigan police officers and child protective services met

with Mother to assist her in moving out of the Michigan residence she shared with Father. Mother initially told the authorities that the relationship was consensual, but she also said that Father wanted to marry her and get her pregnant "as soon as possible." Mother wanted out of the relationship and she wanted to return to Georgia, but she was concerned her vehicle would not make the trip. She also did not have the financial means to get back to Georgia. Ultimately, financial assistance was provided to Mother and she left Father's residence in Michigan.

{¶5} Mother only made it as far as Findlay, Ohio before she stopped. It is not entirely clear if Mother stopped because she wanted to go back to Father in Michigan or if there was a problem with her vehicle. Regardless, on August 24, 2022, Mother came into contact with law enforcement in Ohio, and, as an unaccompanied minor, Mother was placed in the temporary custody of Hancock County Department of Job and Family Services ("HCDJFS").

{¶6} Mother was in HCDJFS custody from August of 2022 until February of 2023. While Mother was in the temporary custody of HCDJFS, she disclosed that she was in an emotionally, physically, and sexually abusive relationship with Father. The FBI conducted a forensic interview of Mother, wherein Mother stated that Father had sexually assaulted her in Georgia and in Birmingham, Michigan. Mother described one incident where Father ripped her clothes off and cut them with a knife to engage in sexual activity. Mother stated that Father would buy her alcohol and "vapes" and would financially provide for her only "under the premise that she

-3-

continues to have sex with him." Mother stated Father forced her to perform sexual acts that were painful. Mother was subsequently taken to St. Rita's Hospital in Lima for a sexual assault exam. A detective in Birmingham Michigan indicated that he submitted a report to the prosecutor's office with "warm consideration" for charging Father, but no charges were filed.

{¶7} HCDJFS sought and received a "no contact" order between Mother and Father, but Mother consistently "reach[ed] out" to father. Mother later stated that she always went back to Father even after running from him. Meanwhile, Father was sending Mother money and emailing her despite the no contact order. In addition, during the time Mother was in HCDJFS custody she had "several incidences of having suicidal ideations" so she was evaluated at a mental health institution. Notably, as a result of the HCDJFS investigation, Father was "indicated" as a sexual abuse perpetrator.

{¶8} HCDJFS attempted to find suitable relative placement options for Mother, but the agency was unsuccessful. Mother turned 18 years old in February of 2023 and she emancipated from HCDJFS's custody at her request. Mother finished high school in Ohio and moved in with a friend with the assistance of a program called "Bridges through Ohio." However, Mother was "kicked out" of the friend's house due, to some degree, to Mother's relationship with Father.

{¶9} Mother stayed in various hotels in early May of 2023. On May 10, 2023, she called a victim's advocate she had been having contact with and Mother stated

that she had "run out in front of a semi" reflecting her suicidal ideations. Mother then went to live at "Children's Lantern," a program for individuals who had aged-out of foster care in Defiance Ohio.

{¶10} While Mother was staying with Children's Lantern, Father came to see her multiple times, staying in a nearby hotel. There was an incident in July of 2023 wherein Mother alleged that she went to Father's hotel to tell him the relationship was over, but Father wanted to have sexual intercourse. Mother claimed she said no, but Father forcefully had sexual intercourse with her. Father denied the incident occurred when questioned by law enforcement. The matter was referred to the prosecutor's office but no charges were filed.

{¶11} Another incident occurred involving law enforcement in July of 2023 wherein Father was attempting to break into Mother's apartment. Law enforcement was called and responded to the scene but Father was already gone by that point.

{¶12} Over the following months, Mother resided at Children's Lantern but maintained contact with Father. Mother disclosed her pregnancy in late December of 2023. During her pregnancy Mother resided in numerous places such as the YWCA in Van Wert, Ohio, and a residence in Toledo. She later stayed at a residence in the Cleveland area through "Hannah's House."

{¶13} Mother gave birth to A.C. on September 2, 2024. Father was present at the hospital when Mother gave birth, but Mother did not want Father in the birthing room. After she was discharged, Mother left the hospital and returned to

Hannah's House, but by mid-October of 2024, Mother left her residence with Father to return to Georgia.

**{¶14}** On October 21, 2024, Georgia's Athens Park County Police Department responded to a residence where Mother, Father, and A.C. were staying in Athens, Georgia. There was an allegation that A.C. had been "dropped" on a bed by Mother and that Mother had struck Father. Law enforcement officers made contact with Mother and Father and both parents denied anything had happened. Mother did not remember the incident but Father stated that was because Mother had "blackouts" and that she did not remember things. After checking on the child and finding her in good health, law enforcement left the scene.

**{¶15}** Approximately an hour later law enforcement was called back to the residence by Father who claimed that Mother was having a mental health episode in which she was making suicidal remarks. Law enforcement returned to the residence and found that Mother's "demeanor was drastically different from . . . earlier." Mother stated that Father was "controlling" and "manipulative" and that while she had a child with Father, she was unsure if Father was actually the biological father of the child. Mother expressed to law enforcement that she wanted to go to a shelter, but she was concerned A.C. would be taken away. Seeing no evidence of physical harm, the officers provided information to Mother and Father and again left the residence.

{¶16} The Georgia incident was assigned to a detective for investigation. The detective was unable to contact Father and when the detective went to the residence where police had responded, he learned that Mother and Father had already moved out. As the detective investigated the incident, he learned that Mother's employer listed on her lease application was actually Father's phone number.

{¶17} The detective also learned about the FBI investigation regarding Father's relationship with Mother. He also discovered investigations that had occurred in Ohio and Michigan as well. In addition, the detective learned that Mother's sister was a victim of human sex trafficking in a different jurisdiction.

{¶18} After the incident in Georgia, Mother contacted a victim's advocate she had worked with previously in Ohio. The victim's advocate assisted in getting Mother and A.C. back to Ohio with bus tickets at the end of October of 2024. Mother returned to Defiance County to Children's Lantern housing.

{¶19} Mother was in Children's Lantern housing when an incident occurred that led to the instant case being filed. On January 8, 2025, Mother made threats that she was going to kill herself and A.C. Law enforcement responded to Mother's residence and Mother admitted to making the threats. She also indicated that she was bipolar and was not taking medication. She stated she did not know why she made the threats because she was not going to actually follow-through. Law enforcement "completed a pink slip, which basically forced [Mother] to stay [at a mental health facility] until the doctors were done with her . . . evaluation." Mother

was taken to the Coping Center unit of the ProMedica Defiance Regional Hospital where she stayed until January 13, 2025. Mother was diagnosed with major depressive disorder, postpartum, and PTSD.

{¶20} On January 9, 2025, DCJFS sought and received ex parte temporary custody of A.C. The child was placed with a foster family. A complaint was also filed alleging that A.C. was a dependent child. In addition, a GAL was appointed for A.C.

{¶21} When Mother was released from the Coping Center on January 13, 2025, she learned she was being evicted from Children's Lantern. At the time, Mother was unsure whether she wanted to reunify with A.C. or place her up for adoption.

{¶22} An initial case-plan was filed February 11, 2025. Father was not included on the initial case plan because paternity had not yet been established. Paternity was established and Father became a party to the case on February 21, 2025.

{¶23} On February 25, 2025, A.C. was adjudicated a dependent child. Father requested that A.C. be placed with him, but the trial court indicated since Father was, by his own statements, working and residing in Michigan, an "Interstate Compact for the Placement of Children" or "ICPC" had to be undertaken before the child could be placed with him.

{¶24} Mother and Father went to Georgia while the case was pending and got married. Mother's testimony regarding the marriage itself was troubling. Mother claimed that at the time of the marriage ceremony, Father told Mother he was taking her to see a woman that was going to do a prayer service. Mother stated, "That is exactly what the lady did for us. I had no idea that she was doing the marriage until later, so it was unbeknownst to me." Mother stated there was no wedding ceremony and she never said any vows. At one point, Mother called a clerk of courts in Georgia and told her that she did not want to be married to Father and had been forced against her will. Regardless, a marriage certificate was filed and Mother and Father were officially married in March of 2025.

{¶25} On April 9, 2025, a dispositional hearing was held placing A.C. in the temporary custody of DCJFS for a period of one year. Mother and Father were ordered to comply with case planning services and an ICPC was ordered for Father's residence. Notably, Father's inclusion on the case plan was delayed because he would not sign a case plan that had allegations he had "trafficked" Mother.

{¶26} The ICPC was also delayed because Father would not or could not provide a stable address to be assessed.[1] In June of 2025, a home visit for the ICPC was finally conducted at the address Father provided for his residence in Michigan. The Michigan caseworker noted numerous issues. First, Mother was present in the

---

[1] Around this time Mother was listing an unverified address connected to either a domestic violence or a human trafficking shelter.

home despite not being listed as a household member. The caseworker was also aware of the "no-contact" order between Mother and Father.

{¶27} When the caseworker went into the home there was "not much furniture." The interview was conducted at a dining room table with some folding chairs. Wires were exposed in the home, ceiling fixtures were hanging, and there were doors placed over a bedroom window. The caseworker indicated that Father seemed intoxicated and was repeatedly confused as to why the caseworker was present despite the appointment being prescheduled. The caseworker testified that there were loud barking dogs and she was not allowed into the basement of the home. The caseworker was also not allowed access to go into the "loft space" or the refrigerator. Father claimed the caseworker was lying.

{¶28} The Michigan caseworker testified that she only observed one takeout container of food in the home and Mother was eating from it. The Michigan caseworker was only able to briefly talk with Mother because Father told Mother to go into the bedroom.

{¶29} Father claimed to be working as a carpenter, but he did not provide any verification of his employment or his income. The ICPC was ultimately denied for numerous reasons such as "[t]he interactions with [Father] and [Mother], the lack of participation in services, the lack of documents requested and not received, the condition of the home, [and] prior CPS cases[.]"

{¶30} Mother had her first visitation with A.C. on February 11, 2025, but she did not attend any visitations after that date until June 15, 2025. Mother and Father initially had to have separate visitation times with A.C. because of the "no contact" order. Bizarrely, on some occasions Mother cancelled her visitation but sat outside of the visitation in Father's vehicle while Father had his visitation with A.C. Mother attended seven total visitations with A.C., but one of those visits Mother left after only five minutes.

{¶31} Father exercised his supervised visitations regularly, but by all accounts, other than his own, the visitations did not go well. Father was described as hostile to the point that a second monitor had to be present for the visitations. The police were called as a result of Father's hostility one occasion.

{¶32} Father was also described as not receptive to suggestions that were made to him. Despite Father's regular visits with A.C., supervisors did not observe a bond between Father and A.C. It was also noted that Father did not understand, or try to understand, A.C.'s "cues." Father attempted to force-feed A.C. when she was not hungry and tried to make her sleep when she was not tired, forcing A.C.'s head down to nap. During one visit that the GAL observed between Father and A.C., the GAL suggested that Father, the GAL and A.C. all get on the floor to play. Father indicated he would not sit on the floor with the GAL "and play[]house" because it was disrespectful to his wife.

{¶33} On July 1, 2025, DCJFS filed a motion for permanent custody of A.C. The motion alleged that the ICPC had been denied so to the extent Father and/or Mother had a stable address given all of their repeated changes of address, the residence they had was not appropriate for a child.[2] In addition, it was noted that Mother went 124 days without seeing or supporting A.C. and that Father's visits with A.C. were regular but "concerning."

{¶34} The matter proceeded to a final hearing on September 22-23, 2025. The evidence presented detailed the history of Mother and Father's relationship and A.C.'s history. Father testified on his own behalf and claimed that numerous people who testified were all lying. Father believed that the only reason the case was started was because numerous caseworkers in multiple states conspired to put A.C. up for adoption.

{¶35} At the conclusion of the hearing, the trial court took the matter under advisement. On October 3, 2025, the trial court issued a final judgment entry granting permanent custody of A.C. to DCJFS. The trial court summarized the evidence and determined that A.C.

> cannot be placed with either of her parents within a reasonable time, and should not be placed with either of her parents under . . . [R.C.] 2151.414(B)(1)(a), due to the ongoing instability in [parents'] lives, neither parent adequately completing case planning efforts, and neither parent receiving an approved ICPC home study.

---

[2] At the dispositional hearing it was noted that Father listed his address as that of an "Airbnb" and at another point he listed the address of a Kroger.

(Doc. No. 156). In addition, as it relates to Mother, the trial court determined that Mother abandoned A.C. as defined in R.C. 2151.011(C) by failing to visit or maintain contact with A.C. for more than 90 days. The trial court also determined that it was in A.C.'s best interests for DCJFS to be granted permanent custody.

{¶36} Both Mother and Father appeal the trial court's judgment. Mother asserts the following assignment of error for our review.

**Mother's Assignment of Error**

**It was not in A.C.'s best interest to be placed into the permanent custody of the Agency because there was still time left in the case and Mother was in compliance with the majority of her case plan services.**

Father asserts the following assignments of error for our review.

**Father's First Assignment of Error**

**The trial court erred and abused its discretion in violation of Father's Fourteenth Amendment to the United [States'] [sic] Constitution Due Process Clause and Article I Section Sixteen of the Ohio Constitution in finding that permanent custody was supported by clear and convincing evidence, and in terminating Appellant's parental rights when the trial court's judgment was against the weight of the evidence.**

**Father's Second Assignment of Error**

**The trial court erred in not eliminating Father's child support arrearage when the child was eligible for SSDI payments due to Father's disability and the Agency did not apply for them.**

*Mother's Assignment of Error; Father's First Assignment of Error*

**{¶37}** In her assignment of error, Mother argues that the trial court erred by determining that the evidence supported findings related to the first prong of the permanent custody analysis under R.C. 2151.414(B)(1), and that the trial court erred by determining that it was in A.C.'s best interests for permanent custody to be granted to DCJFS. In Father's first assignment of error, he also challenges both the trial court's findings under R.C. 2151.414(B)(1) and the trial court's findings regarding the best interests of A.C.

Standard of Review

**{¶38}** "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.). The Supreme Court of Ohio clarified the manifest-review standard in parental rights cases in *In re Z.C.*, 2023-Ohio-4703, holding that when reviewing a court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 18. Mother's assignment of error and Father's first assignment of error challenge the termination of their parental rights under a manifest-weight standard.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

Analysis

**{¶39}** Revised Code 2151.414 sets forth specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 2007-Ohio-1104, ¶ 22. Specifically, there are two separate elements that must be established by clear and convincing evidence: (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) must apply; and (2) granting permanent custody to an agency must be in the child's best interest. R.C. 2151.414(B)(1). Mother and Father argue that the trial court's determinations regarding both permanent custody elements were against the weight of the evidence. We will review each issue in turn.

**{¶40}** First, Mother and Father both argue that the trial court erred by determining that the evidence supported findings establishing the first prong of the permanent custody analysis under R.C. 2151.414(B)(1). The relevant statutory subsections the trial court determined to be applicable read as follows:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section,

-15-

by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

R.C. 2151.414(B)(1).

**{¶41}** With regard to Mother, the trial court determined that both R.C. 2151.414(B)(1)(a) and (B)(1)(b) applied in this instance. The abandonment finding under R.C. 2151.414(B)(1)(b) was not made with regard to father. Abandonment is defined in R.C. 2151.011(C) as follows:

For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.

**{¶42}** In this case, Mother had no contact with A.C. from February 11, 2025 until June 15, 2025. Mother did eventually resume contact with A.C.; however, based on the plain statutory definition of "abandonment," Mother failed to visit or maintain contact with A.C. for over ninety days. Thus we do not find that the trial

court erred by finding that Mother met the statutory definition for abandoning A.C. during this case. The evidence clearly and convincingly supported a finding under R.C. 2151.414(B)(1)(b) related to Mother.

{¶43} Mother and Father also argue that the trial court erred by finding that A.C. cannot or should not be placed with Mother and Father within a reasonable time pursuant to R.C. 2151.414(B)(1)(a). In determining whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents pursuant to R.C. 2151.414(B)(1)(a), the trial court is directed to consider the factors contained in R.C. 2151.414(E) alongside "all relevant evidence." Revised Code 2151.414(E) contains the following factors.

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(10) The parent has abandoned the child.

. . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

. . .

(16) Any other factor the court considers relevant.

{¶44} After reciting the evidence in this case, the trial court determined that "due to the ongoing instability in [Mother and Father's] lives, [and] neither parent adequately completing case planning efforts, and neither parent receiving an approved ICPC home study," A.C. could not and should not be placed with either parent within a reasonable time.

{¶45} Although Mother challenges the trial court's finding under R.C. 2151.414(B)(1)(a), even if we agreed with Mother we could not reverse the matter as it relates to her because the abandonment factor under R.C. 2151.414(B)(1)(b) was established by clear and convincing evidence. Thus an additional finding under R.C. 2151.414(B)(1)(a) related to Mother would only be superfluous. *In re X.M.W.*,

2020-Ohio-449, ¶ 11 (1st Dist.); *In re L.F.*, 2025-Ohio-3026, ¶ 32, fn. 3 (3d Dist.). Therefore, we will focus on Father's arguments related to R.C. 2151.414(B)(1)(a)/(E).

{¶46} Father first argues that he was not given a reasonable amount of time to complete the case plan. Father contends that the amended case plan with him as a participant was not filed until May 1, 2025 and the permanent custody motion was filed on July 1, 2025. He argues that he had only two months to work the case plan, which was facially insufficient. Further, he contends that a caseworker actually testified that the amount of time was generally not enough to work a case plan.

{¶47} In reviewing Father's argument, we note that a case plan including Father was drafted earlier than the one that was filed, but Father would not sign the case plan because it contained statements that he had been accused of "sex trafficking" Mother. Regardless, testimony indicated that Father was not compliant with his case plan in multiple respects. For example, Father never established that he had a suitable residence in which A.C. could be placed. The ICPC, conducted by a Michigan authority, rejected Father's residence as a suitable placement option. Moreover, Father was *extremely* transient, moving from address to address both when he and Mother were together before A.C.'s birth and after this case began.

{¶48} Furthermore, this case is replete with significant allegations placing Father's character and his actions into question. For multiple years Mother has made allegations of physical, emotional, and sexual abuse against Father. While no

charges had been filed at the time of the final hearing, multiple law enforcement officers testified that cases had been referred to the prosecutor's office for consideration.

{¶49} In addition, although Mother was adamant at the final hearing that Father had never "trafficked" her, she did clearly testify that he had "groom[ed]" her, and that he had admitted as such in the past. Given the age difference between Father and Mother, this testimony is troubling. Moreover, Mother's testimony regarding her marriage to Father and the circumstances surrounding the "prayer" incident are also concerning.

{¶50} Aside from Mother's allegations, Father exhibited poor behavior throughout this case. He was so aggressive with caseworkers that law enforcement had to be called in one instance and multiple monitors had to be present for his supervised visitations. Father also did not respond well to suggestions and he did not recognize cues of discomfort from A.C.

{¶51} Further, Father's purportedly "controlling" behavior of Mother was exhibited in front of other witnesses. Father told DCJFS employees that any contact with Mother needed to go through him. He told Mother to go into a bedroom when the Michigan caseworker was doing the ICPC. At the final hearing, Mother was asked by the GAL if Father "speak[s] for [her] often" and Mother responded "I feel like I do not have to speak on that because y'all can observe what you see." The GAL indicated it was her observation that Father often did not let Mother speak

freely. The GAL asked if her observation was accurate and Mother responded "[i]f you conclude that."

**{¶52}** Separately, it is unclear to what extent Father is able to provide for A.C. He regularly was unable to provide employment verification despite stating that he was "always" working. He indicated he received disability payments each month due to back issues. At the final hearing, Father produced a document, for the first time, purporting to be from the Social Security Administration indicating that he received $1731.90 per month before deductions.[3] For some reason throughout the case he repeatedly did not provide any income verification when asked by caseworkers. Father also never provided any corroborating evidence of his ongoing work as a "carpenter."

**{¶53}** Finally, testimony indicated that A.C. was not bonded to Father in the same way she was to Mother. It was also indicated that Father repeatedly missed cues from A.C. and that Father was not open to constructive suggestions.

**{¶54}** Given that the Michigan caseworker had determined Father's then-current residence was unsuitable, it is unclear how A.C. could have been placed with Father in any reasonable amount of time. In fact, the address Father gave at the final hearing was different than the address that was evaluated for the ICPC, further indicating his transient nature.

---

[3] The letter was not authenticated and contained no employee names.

{¶55} Undoubtedly Father had a short time to actively work on his case plan goals. He suggests his case is similar to *In re M.P.*, 2015-Ohio-2226 (9th Dist.), wherein the Ninth District Court of Appeals determined that the evidence did not sufficiently establish that a mother could not be reunified with her child within a reasonable time under R.C. 2151.414(B)(1)(a). In *M.P.*, the Ninth District determined that an agency moving for permanent custody six months after a case plan was adopted was not sufficient time to work the case plan where the mother, *inter alia*, was working with another agency and the GAL was not operating as a neutral authority.

{¶56} While *M.P.* provides some facial support for Father's argument, *M.P.* is extremely fact-specific as is the case *sub judice*. In fact, in this case the parents had no suitable home that the child could be placed in. Further, the absolutely tumultuous relationship between Mother and Father did not seem to improve such that it would be a healthy environment for a child.

{¶57} Father also argues that the ICPC was not necessary in this case as he was a non-custodial parent pursuant to an exception to the ICPC in R.C. 5103.20(B)(5). However, the evidence does not establish that Father met the requirements of establishing an exception under R.C. 5103.20(B)(5). The exception requires that the "non-custodial parent proves to the satisfaction of a court in the sending state a substantial relationship with the child." The exception also requires that the "court in the sending state makes a written finding that placement with the

non-custodial parent is in the best interest of the child." Even if the first portion of the exception was met, the second exception requirement was not. In fact, at the dispositional hearing the trial court determined that A.C.'s residence with Mother and/or Father would be contrary to A.C.'s beset interest and welfare. (Doc. No. 69). Thus Father's arguments regarding ICPC exception are not well-taken.

{¶58} In sum, given all of the evidence presented in the record, we do not find that the trial court erred by determining that A.C. cannot and should not be placed with Father within a reasonable time.[4]

{¶59} With the first prong of the permanent custody analysis supported as to both parents, the trial court was required to proceed to the second prong of the permanent custody analysis—the best interests analysis under R.C. 2151.414(D)(1). This statutory subsection reads as follows:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

---

[4] This would apply to Mother as well, but as we stated previously any such finding related to Mother would be superfluous.

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

We will review each factor of R.C. 2151.414(D)(1).

{¶60} With regard to factor (a), testimony indicated that A.C. was thriving in foster care. By contrast, testimony indicated that A.C. did not have a bond with Father, but she did have a bond with Mother. Father repeatedly missed cues for A.C. and he was not open to coaching assistance.

{¶61} With regard to factor (b), the GAL recommended that DCJFS be granted permanent custody.

{¶62} With regard to factor (c), A.C. had not been in DCJFS's custody for twelve or more months of a consecutive twenty-two month period, weighing to some degree in Mother and Father's favor.

{¶63} With regard to factor (d), testimony indicated that A.C. was in need of legally secure placement and it is not clear if she would ever have a safe, stable, and healthy environment with Mother and/or Father.

{¶64} Factor (e) is relevant to Mother only inasmuch as she was found to have abandoned A.C. for a period of time.

{¶65} After reviewing the factors, the trial court determined that it was in A.C.'s best interests that DCJFS be granted permanent custody. The evidence supports the trial court's lengthy factual findings in this matter, particularly regarding the ongoing instability of Mother and Father. In addition, appropriate housing and employment were also never verified by DCJFS despite repeated attempts.

{¶66} Moreover, it is difficult to emphasize how powerfully the volatility in the relationship between Mother and Father was displayed in the evidence provided. While the allegations against Father have not been charged criminally, the repeated instances of alleged physical, emotional, and sexual abuse in this case are extremely concerning. To the extent that Father denies all of the allegations and claims that all of the caseworkers, or the majority of them, were lying in this matter, the trial court was free to judge the credibility of the witnesses, including Father, and find his denials disingenuous. *See In re B.M.*, 2023-Ohio-4088, ¶ 25 (3d Dist.), citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997) (indicating that deferring to the trial court on matters of credibility is crucial in a child custody case where there may be

much evident in the parties' demeanor and attitude that does not translate to the record well).

{¶67} For all of these reasons, we do not find that this is one of the rare or exceptional cases where the evidence weighs heavily against the trial court's determination. Therefore, Mother's assignment of error and Father's first assignment of error are overruled.

*Father's Second Assignment of Error*

{¶68} In Father's second assignment of error, he argues that the trial court erred by not eliminating his "child support arrearage" when A.C. was eligible for "SSDI payments due to Father's disability."

{¶69} The record reflects that a hearing on child support was held before a magistrate on June 5, 2025. No transcript of the hearing was produced for our review. The magistrate issued a decision on June 26, 2025, finding that Father was "currently not employed, but is a recipient of Social Security Disability benefits of $1,700.00 per month[.]" (Doc. No. 83). As a result of an income determined to be $20,400, Father was ordered to pay a total of $157.54 per month in child support and cash medical support, including fees. The magistrate's recommendations were adopted and ordered by the trial court.

{¶70} There was some discussion at the final hearing about A.C. being eligible for Social Security benefits, but it was not until after the final judgment

entry in this case that Father filed a "Motion for Agency to Apply for Social Security for the Minor Child." The trial court filed an entry stating that since the notice of appeal had been filed, the trial court lacked jurisdiction to rule on the motion. Father now raises the issue on appeal, citing *Williams v. Williams*, 88 Ohio St.3d 441 (2000), in support of his argument.

> In *Williams*, the Supreme Court of Ohio stated,
>
> we hold that a disabled parent is entitled to a full credit in his or her child support obligation for Social Security payments *received* by a minor child. Accordingly, appellant's child support obligation shall be set off by those Social Security payments received on [the child's] behalf.

(Emphasis added.) *Id*. at 444. Father's reliance on *Williams* is misplaced, because the Supreme Court of Ohio offset a child support amount with an amount *actually received* from social security on behalf of the child. Here, the record does not establish that any money has been actually "received" by the minor child, so *Williams* does not compel a different result here.

{¶71} At this time, Father still has a motion pending in the trial court regarding an offset for his child support arrearage. It seems that if the benefits are actually sought and received, Father could have a legitimate argument under *Williams* to offset his child support. But on the record before us, Father's argument is not well-taken. Therefore, his second assignment of error is overruled.

*Conclusion*

**{¶72}** Having found no error prejudicial to Mother and Father, the assignments of error are overruled and the judgment of the Defiance County Common Pleas Court, Juvenile Division, is affirmed.

***Judgment Affirmed***

**MIILER, and WILLAMOWSKI, J. J., concur.**

Case No. 4-25-17

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge


_____
Mark C. Miller, Judge


_____
John R. Willamowski, Judge

DATED:
/jlm

-29-